Timothy O'SHEA t/a Tim's
Amoco, Appellant,

v.

AMOCO OIL COMPANY, Appellee.

No. 88–5386.

United States Court of Appeals,
Third Circuit.

Argued Dec. 8, 1988.

Decided Sept. 25, 1989.

As Amended Oct. 6, 1989.

Rehearing and Rehearing In Banc
Denied Oct. 26, 1989.

Frederic J. Gross (Argued), Frederic J. Gross Law Firm, Mount Ephraim, N.J., for appellant.

William A. De Stefano, Natalie Amann, DeStefano & Guernsey, Philadelphia, Pa., Thomas J. Ciechanowski, Amoco Corp., Chicago, Ill., for appellee.

Jerry S. Cohen, Cohen, Milstein & Hausfald, Washington, D.C., Richard W. Farrell, Stamford, Conn., Dimitri G. Daskalopoulos, Washington, D.C., for amicus curiae of the Service Station Dealers of America, Inc., Fair Franchising Coalition, New Jersey Gasoline Retailers Assn., Pennsylvania–Delaware Service Station and Auto Repair Assn.

Before SLOVITER, BECKER, Circuit Judges and FULLAM, District Judge [*].

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal addresses the vexing question whether Title I of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–06 (1982), prevents a petroleum company franchisor from terminating a gas station franchisee who refuses to comply with a company marketing strategy that demands that the gas station remain open 24 hours a day. The question is a recurring one, apparently because many service station operators find that they operate at a significant loss between midnight and 6:00 a.m.

[*] The Honorable John P. Fullam, Chief United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Title I of the PMPA provides to petroleum franchisees a civil cause of action for wrongful termination. *See id.* § 2805(a). The statute provides that it is unlawful for a petroleum franchisor to terminate a franchisee except in certain specified situations. *See id.* § 2802. The situations relevant to the instant case are as follows: (1) a franchisee may be terminated if it fails "to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship," *id.* U.S.C. § 2802(b)(2)(A); and (2) a franchisor may terminate a franchisee if there is "[a] failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise," but only if the franchisee is given a reasonable opportunity to cure but fails to cure, *id.* § 2802(b)(2)(B).

The instant case involves the question whether Amoco Oil Company ("Amoco") violated the PMPA by terminating its franchisee Timothy O'Shea ("O'Shea"). In July 1987, Amoco notified O'Shea that it was terminating him for failing to comply with the provision of the franchise agreement that required him to operate his station 24 hours a day. O'Shea brought suit in the district court for the District of New Jersey, alleging that the termination violated both the PMPA and the New Jersey Franchise Practices Act ("NJFPA"), N.J.Stat. Ann. § 56:10–1 to 10–15 (West 1989). However, after a bench trial, the district court found that the termination was permitted under either of the two provisions of the PMPA set fourth above and further that O'Shea's NJFPA claim was preempted by the PMPA. O'Shea raises four major arguments on appeal.

First, O'Shea claims that the district court erred in holding that his NJFPA claim was preempted. However, we need not reach the preemption issue because we conclude that O'Shea is barred from litigating his NJFPA claim by New Jersey's version of claim preclusion, labeled the "entire controversy doctrine." O'Shea had previously brought an unsuccessful state court action contending that the 24–hour provision was unenforceable as a matter of state contract law. O'Shea was required by the entire controversy doctrine to bring his NJFPA claim as part of that suit, on penalty of waiver.

O'Shea's second contention is that the district court erred in holding that the termination was proper pursuant to PMPA section 2802(b)(2)(A), which provides that a franchisee may be terminated if it breaches a reasonable and material provision of a franchise agreement. Because we find that O'Shea's termination was proper under section 2802(b)(2)(B), we need not reach this issue.

O'Shea's third and fourth contentions are that the district court erred in holding that the termination was proper under PMPA section 2802(b)(2)(B), which provides that franchisees may be terminated for failure "to exert good faith efforts to carry out the provisions of the franchise" if they are first given a reasonable opportunity to cure, and that, in any case, Amoco did not meet its burden of proving that O'Shea breached the franchise agreement. We agree with the district court that Amoco met its burden of proof on this issue at trial and that the termination was proper on this ground. We will therefore affirm the judgment of the district court.

## I. BACKGROUND

### A. *Facts*

In December 1985, O'Shea purchased a leasehold from and signed a one-year franchise agreement with Amoco to operate an Amoco service station in Evesham, New Jersey. At the time that O'Shea assumed the lease and signed the agreement, the station had been operating 24 hours a day. As part of the franchise agreement O'Shea promised to continue to provide 24–hour service. He did so until February 1986, when an Evesham Township ordinance took effect that barred the sale of gasoline between midnight and six a.m. Amoco did not require O'Shea to operate on a 24–hour basis while the ordinance was in effect.

Amoco and O'Shea jointly brought suit in the New Jersey Superior Court challenging the constitutionality of the ordinance. In

December 1986, O'Shea and Amoco renewed the franchise agreement under the same terms until November 30, 1989. On March 27, 1987, the Superior Court found the Evesham ordinance to be unconstitutional and thus unenforceable.[1] However, O'Shea did not resume 24–hour service.

On May 6, 1987, Amoco wrote to O'Shea requesting that he resume 24–hour operations within ten days. In response, O'Shea requested a meeting with Amoco, which was held on May 14, 1987. At the meeting, Amoco insisted that the station must be operated 24 hours a day and asked O'Shea to provide Amoco with a written plan of how he would resume full-time service. On May 22, 1987, O'Shea wrote to Amoco and advised that he would resume 24–hour service on June 22, 1987 by hiring high school students, who would then be on vacation, to fill the "graveyard-shift" positions.

In the meantime, O'Shea brought suit against Amoco in the Superior Court of New Jersey, asking that Amoco be enjoined from enforcing the 24–hour requirement in the franchise agreement because: (1) the agreement was signed while the Evesham ordinance was still in force; and (2) in response to O'Shea's objection to the inclusion of the 24–hour provision while the ordinance was in force, an Amoco representative had stated that corrections would be made to the agreement. On June 4, 1987, the Superior Court entered a temporary restraint against Amoco, preventing it from enforcing the 24–hour provision of the agreement. This restraint remained in effect until July 1, 1987.

On June 29, Amoco notified O'Shea that it had observed that the station was closed at 11:45 p.m. on June 22 and that O'Shea would be terminated if there were any further violations of the 24–hour provision. On July 1, a Superior Court judge vacated the restraint and set the case for summary trial in August. *See* Super.Ct., No. L–78390–87, trans. at 18 (July 1, 1987). On July 8, Amoco wrote to O'Shea terminating

his agreement effective October 30, 1987. The letter alleged that O'Shea had breached the 24–hour provision of the contract as his station was not open on June 22, 1987, at 11:45 p.m., and not open on July 4, 1987, at 11:58 p.m. The letter further stated that this constituted a breach of a term of material significance and a failure by O'Shea to exercise good faith efforts to carry out the provisions of the franchise agreement.

On August 11, 1987, the Superior Court entered judgment in favor of Amoco, holding that the 24–hour provision of O'Shea's lease was valid and enforceable. *See* Super.Ct. Letter Op., No. L–78390–87 (Aug. 19, 1987), J.A. at 229–31. O'Shea did not appeal that decision. O'Shea resumed 24–hour operations in October 1987 and filed this action in the district court on October 5, alleging that his termination violated Title I of the PMPA, 15 U.S.C. § 2801–06. Amoco agreed to retain the status quo pendente lite; thus O'Shea is still operating the Amoco franchise.

### B. *The PMPA*

Congress enacted Title I of the PMPA in 1978 in order to protect franchisees exploitation by large petroleum companies. *See* S.Rep. 731, 95th Cong.2d Sess. 17–18, *reprinted in* 1978 U.S.Code Cong. & Admin. News 873, 875–77 (hereinafter "Senate Report"). Congress determined that the oil company franchisors possessed disproportionate bargaining power vis-a-vis their franchisees because franchisees depend on the franchisors for their supply of gasoline and because the franchisors often control the premises upon which the franchisees operate. *See id.* Consequently, petroleum franchisees risk losing completely the return from their prior investments, and potentially their livelihood, if their franchise agreements are terminated. Congress also found that franchisors "had used their superior bargaining power and the threat of termination to gain an unfair advantage in contract disputes." *Slatky v. Amoco Oil Co.,* 830 F.2d 476, 478 (3d Cir.1987) (in

---

**1.** The Superior Court decision left the question of damages against the township open. Amoco subsequently settled with Evesham for nominal

damages. O'Shea is still pursuing his damage claim against the township. *See* Trial Trans. at 38 (Testimony of Timothy O'Shea), JA at 147.

banc). Congress therefore enacted legislation giving petroleum franchisees rights against termination and non-renewal of their franchises.

Title I of the PMPA provides in relevant part that "[e]xcept as provided in subsection (b) of this section, ... no franchisor engaged in the sale ... of motor fuel in commerce may—(1) terminate any franchise ... prior to ... the expiration date ... stated in the franchise." 15 U.S.C. § 2802(a)(1). The relevant exceptions are as follows:

> (2) For purposes of this subsection, the following are grounds for termination of a franchise ...:
>
>> (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship....
>>
>> (B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—
>>
>>> (1) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions....

*Id.* § 2802(b)(2).

The PMPA is not designed to eliminate the petroleum companies' ability to set their own marketing strategies or to prevent the companies from terminating franchisees in appropriate cases. As the Senate Report describes, "[l]egislation in this subject area requires recognition of the legitimate needs of a franchisor to be able to terminate a franchise ... based upon certain actions of the franchisee, including certain failures to comply with contractual obligations...." Senate Report at 19, 1978 U.S.Code Cong. & Admin.News 877. The PMPA is designed to accord flexibility to the petroleum companies to refine their marketing strategies and change them in response to changed conditions. *Id. See also Darling v. Mobil Oil Corp.,* 864 F.2d 981, 983–84 (2d Cir.1989) (describing the legislative history of the PMPA). Congress drafted the statute in broad terms, leaving it in large part for the courts to

strike the balance between protections for the franchisee and flexibility for the franchisor. *See id.* at 989.

The PMPA has the additional purpose of creating a uniform national system of petroleum franchise terminations. The PMPA provides that

> [t]o the extent that any provision of this subchapter applies to the termination ... of any franchise ... no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation ... with respect to termination ... of any such franchise ... unless such ... law ... is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a). In this regard, Congress thought it important that there be a clear, uniform definition of the rights of franchisors and franchisees with respect to "the crucial area of termination of a franchise." *See* Senate Report at 18–19, 1978 U.S.Code Cong. & Admin.News 876–878. The PMPA preempts the "uneven patchwork of rules" adopted by the several states, to regulate the grounds, procedures, and notice requirements for termination of a petroleum franchise. *Id.* at 19, 1978 U.S. Code Cong. & Admin.News 877. *See also Bellmore v. Mobil Oil Corp.,* 783 F.2d 300, 304 (2d Cir.1986).

### C. *The District Court's Decision*

O'Shea's suit in district court alleged that his termination violated the PMPA because it did not fit into any of the exceptions contained in the statute. He argued that the question whether a provision is reasonable and material should be evaluated "objectively," under a broad totality-of-the-circumstances test, and that under that standard the 24–hour provision was neither reasonable nor material to the franchise relationship. However, after a bench trial, the district court found that, under the PMPA, the question whether a provision is reasonable is to be answered under a subjective criterion—from the perspective of the franchisor—and that courts are not allowed to substitute their business judgment for that of the franchisor. *See* Dist.Ct.Op. at 7–8 (April 19, 1988). The court thus asked

whether the 24–hour provision was adopted "in good faith" and "in the normal course of business," adopting this language from other sections of the PMPA. *Id. See also* 15 U.S.C. § 2802(b)(2)(E), (b)(3)(A), (b)(3)(D).

Under this standard, the court found the 24–hour provision to be "clearly reasonable," as it reflected Amoco's belief that "full-time service stations increase sales volume, not only during the late hours they are open, but throughout the entire day." Dist.Ct.Op. at 9. The court further declared that evidence of hardship on a particular franchisee is not relevant to the reasonableness inquiry. And the court noted that there was no evidence that O'Shea had been singled out for discriminatory treatment. *Id.* Finally, the court found the provision to be material to the franchise relationship. *Id.* The district court therefore found that termination was proper under 15 U.S.C. § 2802(b)(2)(A).

Alternatively, the court held the termination proper under section 2802(b)(2)(B) because O'Shea failed to exert good-faith efforts to carry out the provisions of the franchise. Specifically, the court found that "[i]t would strain credulity to conclude either that O'Shea exerted a good-faith effort to comply with the terms of his lease or that Amoco did not give him a reasonable opportunity to bring himself into compliance." *Id.* at 10–11. The court noted that Amoco had provided O'Shea with an opportunity to cure by June 22, 1987, but that instead of curing, O'Shea filed suit in state court.

The NJFPA provides in relevant part that it is unlawful "for any franchisor, directly or indirectly, through any officer, agent or employee, to . . . impose unreason-

able standards of performance upon a franchisee." N.J.Stat.Ann. § 56:10–7e. O'Shea claimed that the 24–hour provision of the franchise agreement violated the NJFPA and was thus unenforceable. *See* Complaint at 17, J.A. at 19.[2] The district court held this claim to be preempted by the PMPA, finding it to be based on a state law relating to franchise termination. *See* Dist.Ct.Op. at 12.[3]

## II. THE NJFPA CLAIM

### A. *Background and Contentions*

O'Shea contends that the district court erred in holding that his NJFPA claim was preempted by the PMPA. The NJFPA was enacted by the New Jersey legislature for the purpose of protecting franchisees in many industries from the dangers of exploitation inherent in the franchise relationship. *See New Jersey American, Inc. v. The Allied Corp.*, 875 F.2d 58, 61–63 (3d Cir.1989). For the reasons that follow, we do not reach the preemption question.

The NJFPA enumerates several "prohibited practices," one of which is the imposition of "unreasonable standards of performance upon a franchisee." N.J.Stat. Ann. § 56:10–7e. O'Shea contends that requiring a franchisee to remain open 24 hours a day even if it is not profitable to do so constitutes the imposition of an unreasonable performance standard.[4] Section 56:10–7e of the NJFPA does not itself provide a remedy, but a later section of the act provides that "[a]ny franchisee may bring an action against its franchisor for violation of this act in the Superior Court of the State of New Jersey to recover damages sustained by reason of any violation of this

---

**2.** O'Shea also argued that the termination of a franchisee based on an unenforceable provision of a contract is necessarily a violation of the PMPA.

**3.** O'Shea had also raised the same claims that he raised in his Superior Court suit—that the 24–hour provision of the lease was void because it was illegal at the time it was entered into and because it was the product of fraud. The district court found these claims to be barred by res judicata. O'Shea does not pursue these claims in this appeal.

**4.** There is evidence that it is unprofitable for O'Shea to remain open between midnight and 6:00 a.m. O'Shea testified that he generally sold only 100 gallons each night on the graveyard shift. *See* Trial Trans. at 23 (testimony of Timothy O'Shea), J.A. at 132. Because his average mark-up was only nine or ten cents a gallon, he earned, on the average, only ten dollars per night on that shift over the cost of materials. *Id.* at 16–17, J.A. at 126–27. This income was more than offset by the costs of operating the shift. *Id.* at 25–26, J.A. at 134–35.

act and, where appropriate, shall be entitled to injunctive relief." *Id.* § 56:10–10. However, O'Shea did not ask for relief under state law for this alleged violation of the NJFPA. Instead, he pled that the 24–hour provision would be unenforceable as a matter of state contract law, because it reflects a "prohibited practice" under state law, and that it violates the PMPA to terminate a franchisee based on an unenforceable provision of a contract. *See* Complaint at 16–17, J.A. at 18–19.

O'Shea's only support for his contention that it violates the PMPA to terminate a franchisee on the basis of a contract provision that is prohibited by state law is one court's view that state law determines how to interpret the franchise agreement at issue in a PMPA action. *See Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 712 (7th Cir.1985). Even if we were to adopt the position that we should borrow state contract law in PMPA suits, this is far different from saying that violations of state laws governing franchise agreements are *ipso facto* violations of the PMPA. As noted above, one of the PMPA's purposes was to create a uniform system of petroleum franchise terminations. If we were to interpret the PMPA as incorporating the patchwork of state substantive laws regulating franchise agreements, as O'Shea would have us do, the uniformity purpose would not only be disserved: it would be obliterated.

■ Although we do not reach the question whether the PMPA preempts state laws defining prohibited practices in franchise agreements, *see infra,* we have been furnished no authority for interpreting the PMPA as *incorporating* such state laws. We are satisfied that to the extent that O'Shea contends that Amoco has violated the PMPA because it has violated the NJFPA, O'Shea has failed to state a claim. However, we must construe pleadings liberally. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). We therefore will consider O'Shea's claim as a pendent state claim, alleging that Amoco has violated the

NJFPA by terminating him for violating the 24–hour provision.

Amoco has several responses to O'Shea's NJFPA claim. First, it contends that the district court was correct in holding that section 56:10–7e is preempted by the PMPA because the New Jersey statute restricts the grounds for which a franchisee can be terminated. Second, it contends that the 24–hour provision is not a "standard[ ] of performance" within the meaning of the NJFPA, and, alternatively, that if it is a standard of performance, it is a reasonable one. Finally, Amoco argues that O'Shea is barred from raising his NJFPA claim at this juncture under the "entire controversy" doctrine, which is New Jersey's version of claim preclusion, because the NJFPA claim is closely related to the claims O'Shea brought in his state court suit.[5] Because it is dispositive of the issue, we turn to this last contention first.

## B. *Impact of the Entire Controversy Doctrine*

■ "The entire controversy doctrine requires that a person assert in one action all related claims against a particular adversary or be precluded from bringing a second action based on the omitted claims against that party." *Melikian v. Corradetti,* 791 F.2d 274, 279 (3d Cir.1986). The doctrine is " 'rooted in the need to protect a defendant from a multiplicity of suits and their attendant harassment,' as well as public policy considerations against piecemeal litigation in the interest of orderly administration of justice." *Gareeb v. Weinstein,* 161 N.J.Super. 1, 9, 390 A.2d 706, 710 (App.Div.1978) (citation omitted). The test for whether claims are "related" such that they must be brought in a single action is as follows:

'[If] the litigants in the action as framed will, after final judgment therein is entered, be likely to have to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of

---

**5.** Amoco has not asserted that the PMPA claim was barred by the entire controversy doctrine.

transactions, then the omitted component must be regarded as constituting an element of the minimum mandatory unit of litigation. That result must obtain whether or not the component constitutes either an independent cause of action by technical common law definition or an independent claim which, in the abstract, is separately adjudicable.'

*Melikian,* 791 F.2d at 279–80 (citation omitted).

█ The federal courts are directed to "give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982) (construing 28 U.S.C. § 1738). Consequently, we must determine in this action whether the NJFPA claim is barred by New Jersey's entire controversy doctrine.[6]

█ O'Shea's NJFPA claim is closely related to the two claims brought in his state court suit; the three claims provide three alternative theories of why the 24–hour provision was unenforceable. As Amoco aptly puts it, "[a]ppellant's withholding his claim under the New Jersey Franchise Act until filing suit in district court, after the state court claims had been finally adjudicated, had the effect of rendering the state court suit 'one inning of the whole ballgame.' " Appellee's Supp.Br. at 7 (citation omitted). Indeed, O'Shea does not contest the assertion that his NJFPA claim is intimately related to the contract law claims he brought in his state court suit. Instead,

O'Shea raises four arguments as to why, despite the similarity of the claims, the entire controversy doctrine should not stand as a bar to his raising his NJFPA claim in this suit.

First, O'Shea contends that the entire controversy doctrine should be applied flexibly and that this case calls for an exception to the rule's application. O'Shea points out that a New Jersey court has held that an exception could be recognized to the mechanical application of the entire controversy doctrine when the equities justify it. *See Brown v. Brown,* 208 N.J.Super. 372, 374, 506 A.2d 29, 30 (App.Div. 1986). The court in *Brown* noted that "the entire controversy doctrine ordinarily requires joinder or attempted joinder of constituent causes arising *pendente lite,*" but concluded that "in exceptional cases there may be countervailing equitable considerations which would render application of that doctrine unfair." *Id.* 506 A.2d at 30. We do not believe this to be such an exceptional case. O'Shea's NJFPA claim that the 24–hour provision was unenforceable as a matter of state law clearly arose before his state-court litigation. Indeed, O'Shea provides no reason why he could not have brought his NJFPA claim at the inception of his state court suit, nor does he identify equitable considerations that would make this an appropriate case for departure from the general rule.[7]

Second, O'Shea argues that application of the entire controversy doctrine "must be tempered in cases where, as here, some aspects of the controversy can never be heard in any State forum." Appellant's Supp.Br. at 3. O'Shea supports this con-

---

**6.** Both New Jersey law and federal law treat claim preclusion as an affirmative defense that must be pled in the defendant's reply, or otherwise timely raised. *See Brown v. Brown,* 208 N.J.Super. 372, 384, 506 A.2d 29, 35 (App.Div. 1986); Fed.R.Civ.P. 8(c). Although Amoco did not raise the entire controversy defense in its reply in the instant action, we find that it did raise it in a timely fashion by arguing it in the district court at trial without objection from O'Shea. *See* Fed.R.Civ.P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). Indeed, O'Shea does not contend that the entire controversy defense was

waived, although, as discussed below, he contests its applicability.

**7.** O'Shea argues that his NJFPA claim is "part and parcel" of his PMPA claim since he pled that because the 24–hour provision was unenforceable as a matter of state law, it violated the PMPA for him to be terminated on the basis of its breach. Thus, he claims that his NJFPA claim, as pled in this suit, did not arise until his termination. However, as noted above, *see supra* at 590, we hold that violations of state franchise law are not *ipso facto* violations of the PMPA.

tention by noting that one court has held that jurisdiction to hear PMPA claims is exclusively federal. *See Rustom v. Atlantic Richfield Co.,* 618 F.Supp. 210, 214 (C.D.Cal.1985). But it is the NJFPA claim we are considering at this juncture. O'Shea's argument would have to be further analyzed were it true that O'Shea's NJFPA claim could only have been brought in federal court. But it is clear that O'Shea could have brought the NJFPA claim in state court. *See* N.J.Stat.Ann. § 56:10-10. The possibility that his core PMPA claim (his argument that the 24-hour provision was neither reasonable nor material, and that he did not fail to exert good faith efforts to carry out the provisions of the franchise) might have been brought only in federal court is irrelevant to the question whether his NJFPA claim is barred.[8]

Third, O'Shea contends that the prior state court suit does not stand as a bar to his raising the NJFPA claim in this suit because the state court did not have subject matter jurisdiction to enter a judgment in the first suit. Again, relying on *Rustom,* O'Shea contends that the federal courts have exclusive jurisdiction over PMPA claims. He argues that at the moment that he received the notice of termination his state law claims were preempted, and that, at that point, the PMPA became his exclusive remedy. Based on this reasoning, he contends that after the notice of termination was received, the New Jersey court no longer had subject matter jurisdiction over his claims. O'Shea concludes that "the Superior Court litigation must be deemed an aborted proceeding, in which no claim or issue had been the subject of a valid and binding determination," and therefore that there can be no entire controversy preclusion based on the state proceeding. *See* Appellant's Supp.Br. at 6.[9]

O'Shea's argument fails because at least one of the causes of action that he brought in his state court suit was not preempted by the PMPA. O'Shea's state court causes of action were straightforward contract law claims. O'Shea contended that the 24-hour provision was invalid: (1) because it was contrary to a local ordinance at the time it was entered; and (2) because Amoco defrauded him by promising to modify the contract later. *See* Super.Ct. Letter Op., No. L-78390-87. Because of the close relation of his NJFPA claim to both of these state court claims, O'Shea was required by the entire controversy doctrine to bring his NJFPA claim in the state court suit unless the state court did not have jurisdiction over either claim.

■ As noted above, the PMPA preempts only those state laws that regulate the "grounds for, procedures for, and notification requirements with respect to termination," to the extent that such laws are not the same as the PMPA. *Bellmore,* 783 F.2d at 304. The law involved in O'Shea's contract claims in no way involved "procedures for" or "notification requirements with respect to" termination. And, with respect to the grounds for termination, we believe that PMPA only preempts state laws that limit the permissible substantive reasons that a petroleum franchisor can terminate a franchisee. It thus would not preempt the general common law rule that contracts entered into by

---

8. As part of his argument against the "rigid application" of the entire controversy doctrine, O'Shea contends that, applied rigidly, the doctrine would also bar Amoco from raising its defense in the PMPA action that O'Shea's termination was based on the breach of a reasonable and material contract term, because Amoco did not raise that as an affirmative defense in the state court suit. *See* Appellant's Supp.Br. at 4 n. 3. This argument misconceives the nature of the entire controversy doctrine. The doctrine does not require defendants to raise defenses to claims that were not pled by the plaintiff in the state court action, on penalty of losing them. *See Melikian,* 791 F.2d at 279-80.

9. O'Shea never previously raised the contention that his state causes of action were preempted at the moment his PMPA claim arose. Thus, implicit in O'Shea's argument is the premise that preemption is a jurisdictional issue, can be raised any time, and can serve as a basis for a collateral challenge to a court's judgment. Because, as discussed presently, we hold that the PMPA does not preempt at least one of the state causes of action that O'Shea pursued, we need not address the issue whether preemption is jurisdictional.

fraud are unenforceable. The goal of the framers of the PMPA was to create a uniform system of franchise termination, not a uniform system of contract law. The Senate Report on the bill refers to legislative intent to preempt the patchwork of state laws that the states had adopted to address "petroleum product franchising problems." Senate Report at 19. There is no reference to any legislative intent to preempt the general common law of contract, even to the extent that it may become involved in a PMPA action. *Cf. Lippo,* 776 F.2d at 712 ("[F]ranchise agreements governed by the PMPA are to be interpreted according to state contract law.").

■ The fact that the PMPA may be subject to exclusive federal jurisdiction (a question we do not reach) is thus immaterial. O'Shea's fraudulent inducement claim was not a PMPA claim, but instead a state law claim that was not preempted by the PMPA. There is simply no merit to O'Shea's contention that "once a termination notice has been served, the Federal courts acquire [exclusive] jurisdiction over [all aspects of] the controversy." Appellant's Supp.Br. at 16. Once the termination notice has been served, a franchisee can bring a PMPA action in federal court, but a franchisee can also pursue (or continue to pursue) state claims relating to the franchise agreement in state court to the extent that they are not preempted by the PMPA. The state court thus properly asserted jurisdiction at least over O'Shea's claim that Amoco defrauded him into agreeing to the 24–hour provision. Because O'Shea's NJFPA claim is closely related to his fraudulent inducement claim, he is barred by New Jersey's entire contro-

versy doctrine from bringing it as part of the instant suit.

Fourth and finally, O'Shea contends that the entire controversy doctrine does not stand as a bar to his NJFPA claim because his burden of proof on the NJFPA claim would have been greater had he brought that claim as part of his New Jersey state court action than it is as part of his PMPA action.[10] He cites the black letter proposition that *issue* preclusion does not attach when

[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action.

*Restatement (Second) of Judgments* § 28(4), at 273 (1982). He asserts (without argument) that this proposition is also true of claim preclusion—that even if a related claim could have been raised in an initial proceeding but was not, a party is not barred from litigating that claim in a subsequent proceeding, if a party's burden on that claim would have been heavier in the first proceeding. This assertion does not withstand analysis.

The purpose of issue preclusion is to avoid costly relitigation of issues that have already been adequately determined. *See* 1B *Moore's Federal Practice* ¶ 0.441[2] at 729 (1988). The Restatement principle makes sense with respect to issue preclusion because

[t]o apply issue preclusion [when the burden of proof is heavier in the second litigation] would be to hold, in effect, that the losing party in the first action

---

**10.** O'Shea argues as follows:

If O'Shea had raised [an NJFPA] claim in the State court, he would have had to prove each element of his claim by a preponderance of the evidence. Therefore, O'Shea would have lost if [the state court judge] had determined that the evidence were in equipoise as to whether Amoco's 24–hour requirement constituted an 'unreasonable standard of performance' at O'Shea's location.

In significant contrast, under the PMPA, the

statutory burden of bringing forth proof falls upon Amoco, not O'Shea. More particularly, Amoco has the 'burden of going forward with evidence to establish as an affirmative defense that such termination ... was permitted' as an exception to the general rule against franchise terminations. 15 U.S.C. § 2805(c).
Appellant's Supp.Br. at 21. The validity of this reasoning is far from clear, but because we find that even if it were true, O'Shea's argument still fails, we need not address the issue.

would also have lost had a significantly different burden been imposed.... Since the process by which the issue was adjudicated cannot be reconstructed on the basis of a new and different burden, preclusive effect is properly denied.

*Restatement (Second) of Judgments* § 28, comment f, at 281. Therefore, in such cases, it would be both unfair and illogical for issue preclusion to attach.

This principle does not translate to the realm of claim preclusion (of which New Jersey's entire controversy doctrine is a species). Claim preclusion does not merely bar the relitigation of the claims brought in the first suit; it also bars the plaintiff from litigating claims that have never been litigated if those claims should have been brought as part of the first suit but were not. *See Melikian*, 791 F.2d at 279. The purpose of claim preclusion, unlike issue preclusion, is to prevent the waste of resources and the harassment to the defendant that stem from the piecemeal litigation of claims. The purpose of New Jersey's entire controversy doctrine is thus to ensure that, to the extent possible, disputes are settled in a single litigation. *See id.* at 279–80. If O'Shea had brought his NJFPA claim in the state court action, he might have prevailed on the claim there, making a second litigation unnecessary. And applying claim preclusion when there are varying burdens of proof does not raise any problem analogous to the problem of applying issue preclusion identified in comment f to the Restatement.

In light of the foregoing we conclude that the entire controversy doctrine bars O'Shea from now pursuing his NJFPA claim. That claim is sufficiently related to the claims he brought in his prior state court suit that it should have been brought as part of that suit. We therefore will affirm, albeit on different grounds, the judgment of the district court dismissing O'Shea's NJFPA claim.

### III. THE PMPA CLAIMS

#### A.

O'Shea contends that the district court erred in finding that the termination of his franchise was proper under either of two sections of the PMPA: (1) 15 U.S.C. § 2802(b)(2)(A), which provides that a franchisor may terminate a franchisee who fails to comply with a reasonable and material provision of the franchise agreement; and (2) 15 U.S.C. § 2802(b)(2)(B), which provides that a franchisor may terminate a franchisee who fails to exert good faith efforts to comply with the provisions of the franchise, if the franchisee was provided a reasonable opportunity to cure but failed to cure. We conclude that the termination was proper under section 2802(b)(2)(B).

#### B.

Section 2802(b)(2)(B) provides that a petroleum franchisor may terminate a franchisee if there is

[a] failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions

....

15 U.S.C. § 2802(b)(2)(B). The district court found that Amoco's termination of O'Shea was proper on this ground. It first noted that "[i]t is clear that O'Shea was not in compliance with the provisions of his lease for some time after the Superior Court had declared the Evesham Township ordinance unconstitutional." Dist.Ct.Op. at 10. It further noted that on May 6, 1987, Amoco wrote to O'Shea advising him that he should be operating 24 hours a day and that the parties subsequently agreed that O'Shea could have until June 22 to comply. *Id.* The district court concluded:

Despite these assurances, O'Shea filed suit in Superior Court challenging the validity of the terms of his agreement. O'Shea concedes that his station was not open full time until at least October 1, 1987. It would strain credulity to conclude either that O'Shea exerted a good-faith effort to comply with the terms of his lease or that Amoco did not give him

a reasonable opportunity to bring himself into compliance.

*Id.* at 10–11.

O'Shea attacks the district court conclusion on two grounds. First, he argues that section 2802(b)(2)(B) is inapplicable to the instant case, because he only violated one provision of the agreement, whereas the language of section 2802(b)(2)(B) is directed to the violation of "provisions." Second, he argues that, in any case, in light of the fact that there was a state court restraint in effect from June 4, 1987, until July 1, 1987, Amoco did not give him a reasonable opportunity to cure the violation. We reject both of these contentions and will thus affirm the judgment of the district court that Amoco's termination of O'Shea did not violate the PMPA.

O'Shea urges us to read the text of the PMPA strictly. He points out that section 2802(b)(2)(A) allows termination when there is "[a] failure … to comply with *any provision* " of the franchise agreement that is reasonable and material, whereas section 2802(b)(2)(B) allows termination when a franchisee fails to exert "good faith efforts to carry out *the provisions* of the franchise." Based on this difference in language, he argues that section 2802(b)(2)(A) provides for termination for the breach of any one provision that is material and reasonable, and that section 2802(b)(2)(B) provides for termination when a franchisee has breached multiple provisions regardless of their reasonableness, coupled with a failure to cure. We read the PMPA differently.

In ordinary usage, a breach of one term or provision of a contract is commonly referred to as a failure to comply with the "terms" or "provisions" of the contract. Both subsections allow termination for "*a failure* by the franchisee …" *See* 15 U.S.C. § 2802(b)(2)(A) (termination is proper when there is "[a] failure by the franchisee to comply with any provision …"); *id.* § 2802(b)(2)(B) (termination is proper when there is "[a] failure by the franchisee to exert good faith efforts"). Since the phrase "the provisions of the franchise" used in section 2802(b)(2)(B) plainly refers to *all* of the franchise provisions, the failure of the franchisee to exert good-faith efforts to comply with any one or more of the requirements of the franchise can be a basis for termination under that section. In sum, Congress wanted to allow termination under either section based on a single failure by the franchisee. We believe that it is implausible to contend that Congress meant section 2802(b)(2)(B) to cover the (unlikely) case of a single failure by a franchisor that violates multiple provisions.

The grounds for termination or nonrenewal set forth in section 2802(b)(2)(A) and (B) are complementary. Section 2802(b)(2)(A) allows for termination without requiring a chance for cure if a franchisee breaches a reasonable and material contractual term, but using this ground for termination will entail an inquiry into the reasonableness and materiality of the term in question. Termination or nonrenewal under section 2802(b)(2)(B) is permissible without consideration of the reasonableness of the term as long as the franchisee is given an opportunity to comply with the term in question. *See Mobil Oil Corp. v. Karbowski*, 879 F.2d 1052, 1054 (2d Cir. 1989) ("In contrast to section 2802(b)(2)(A), the term "provisions" is not modified by the adjective "reasonable" in section 2802(b)(2)(B)."). However, if the franchisee makes a good faith effort after having been given notice and still cannot comply, then the franchisor will not be able to avoid the reasonableness inquiry that is a component of section 2802(b)(2)(A).[11] O'Shea does not

---

**11.** Although section 2802(b)(2)(B) does not explicitly state a materiality requirement, we nonetheless believe that a franchisor could not justify terminating a franchisee pursuant to the section for failing to exercise good faith in carrying out immaterial provisions of the franchise agreement. Congress clearly stated its purpose to prevent "arbitrary or discriminatory" terminations. Senate Report at 15, 1978 U.S. Code Cong. & Admin.News, 874. If franchisors could terminate franchisees when they fail to comply with immaterial terms, this purpose would be frustrated, because, by definition, a franchisor can have no legitimate reason to terminate a franchise for violating immaterial contract provisions.

In his discussion of section 2802(b)(2)(A), O'Shea alleges that the district court erred in

contend that the breach of the 24–hour provision occurred despite good faith efforts.[12] O'Shea's failure to comply with the 24–hour provision thus fits squarely within the language of section 2802(b)(2)(B).

O'Shea contends alternatively that the opportunity given him to cure was unreasonable. We reject that contention as well. O'Shea notes that Amoco agreed that O'Shea could have until June 22, 1987, to comply with the provision. He further notes that Amoco purports to have terminated him because he was not open at certain times on June 22, 1987 and July 4, 1987. Yet, he points out, on June 4, 1987, the New Jersey Superior Court entered a temporary restraint, which prohibited Amoco from enforcing the 24–hour provision and that the restraint remained in force until July 1, 1987. He thus concludes that "the only time period which conceivably would be relevant to an analysis under subparagraph [280]2(b)(2)(B) is July 1, 1987 ... until July 4, 1987. Even Amoco has never contended that three days is a reasonable time for hiring and training a third shift." Appellant's Br. at 37.

O'Shea is mistaken in his definition of the relevant time period. Although we agree with O'Shea that it was not reasonable to expect him to cure while the state court restraint was in effect. O'Shea did not have merely three days to hire and train a third shift in preparation for curing. O'Shea knew from the beginning that the state court restraint was temporary and could expire after the Court held an additional hearing on the matter on July 1. Thus, O'Shea had a month from the time the restraint was entered to devise a means of compliance should the restraint be vacated. O'Shea provided the district court with no reason why, given that time period, he could not have resumed 24–hour service if he so wished as soon as the restraint was vacated.

■ We believe that section 2802(b)(2)(B) allows terminations for the failure to carry out in good faith even one provision of an agreement, and we agree with the district court that O'Shea was given a reasonable opportunity to cure. We must now turn to the question whether Amoco met its burden of proving that O'Shea breached his agreement because, as long as it did so, the district court's finding that the termination was proper under section 2802(b)(2)(B) must be affirmed.[13]

holding that the 24–hour provision was material to the franchise agreement. In adopting the materiality requirement of § 2802(b)(2)(A), Congress intended to prevent the termination of franchisees based on "the most technical or minor violations of the contract." Senate Report at 18. *See also Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1222 (7th Cir.1982). We construe materiality with respect to section 2802(b)(2)(B) similarly. Applying this test, the 24–hour provision is clearly not technical; it is a significant substantive requirement relating to the way the franchisee must run his business. Nor is it minor. It reflects an important decision by Amoco's management as to how to market its product. *See* Dist.Ct.Op. at 2 ("Th[e] 24–hour provision of the lease is part of Amoco's corporate policy and marketing strategy...."). Indeed, the district court noted that this marketing strategy has been followed by a number of other petroleum distributors. *Id.*

12. We emphasize that this subsection does not allow termination in cases in which the franchisee breached its contract despite its good faith efforts to comply. Thus, for example, if a franchisor were to subject a franchisee to an impossibly high sales output requirement, the franchisor could not then terminate the franchisee pursuant to section 2802(b)(2)(B) when the franchisee breached the provision despite good faith efforts to comply.

13. With respect to section 2802(b)(2)(A), which provides that a franchisor may terminate a franchisee who fails to comply with a reasonable and material provision of the franchise agreement, the district court accepted Amoco's argument that the term "reasonable" should be interpreted to mean reasonable from the perspective of the franchisor. *See supra* at 586. On appeal, Amoco contends that this result is compelled by our decision in *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 481 (3d Cir.1987) (in banc) ("holding that business judgments" made by franchisors should be reviewed deferentially by courts applying the PMPA). In contrast, O'Shea argues that "reasonable" should mean reasonable from an objective point of view and that the court should have weighed the benefit to the franchisor against the hardship to the franchisee in determining whether the 24–hour provision was reasonable. In so arguing, O'Shea urges us to follow a decision of the court of appeals for the Second Circuit, which adopted this objective test. *See Darling v. Mobil Oil Co.*, 864 F.2d 981, 989 (2d Cir.1989).

## IV. THE ADEQUACY OF THE EVIDENCE OF BREACH

Amoco's notice of termination to O'Shea provided as follows:

> In compliance with the provisions of the Petroleum Marketing Practices Act, you are hereby notified that the grounds for [your termination] are that you have breached the hours provision of your contract which provisions are both reasonable and of material significance to the franchise relationship on the following occasions:
>
> Monday, June 22, 1987 at 11:45 PM
>
> Saturday, July 4, 1987 at 11:58 PM
>
> These hours violations also constitute a failure to exert the good faith efforts to carry out the provisions of the franchise.

Letter to O'Shea from Amoco (July 8, 1987).

O'Shea contends that because Amoco was purporting to terminate him for being closed on the two specific instances noted in the letter, it was therefore Amoco's burden to prove that he was in fact closed at those times. As O'Shea points out, once the franchisee has proven the existence of the agreement and that there has been a termination, the burden shifts to the franchisor to prove as an affirmative defense that the termination falls within one of the statutory exceptions to the general ban against terminations. *See* 15 U.S.C. § 2805(c). Thus it was up to Amoco to establish that the agreement had been breached.

O'Shea points out that Amoco never introduced evidence from which it could be concluded that the station was in fact closed at 11:58 p.m. on July 4, 1987. Although the district court found that "the evidence establishes" that O'Shea's station was closed at that time, Dist.Ct.Op. at 4,

Amoco now concedes that it introduced no evidence from which it could be inferred that that was the case.[14]

However, Amoco contends that it did not have to prove that the station was closed at that particular time. It maintains that the reason it terminated O'Shea was that O'Shea had been violating the 24–hour provision; the letter mentioned June 22 and July 4 merely as examples. It points out that there was evidence in the record from which one could infer that O'Shea had been violating the 24–hour provision. O'Shea's wife testified that 24–hour service resumed in October 1987, clearly implying that the station had not been operating 24 hours a day previously. *See* Trial Trans. at 30 (testimony of Karen O'Shea). This testimony is adequate to support the district court's findings. Indeed, even though he does contend that he was open at 11:58 on July 4, O'Shea never contends that he had not been violating the provision.

▮ The question remains, however, whether Amoco was required to prove that O'Shea was closed on July 4. The PMPA provides that the franchisor must send a notice to the franchisee prior to termination and that the notice shall contain "a statement of intention to terminate the franchise ... together with the reasons therefor." 15 U.S.C. § 2804(c)(3)(A). Thus, in order for a termination to be proper under any of the subsections of section 2802(b)(2), the franchisor must comply with the notice requirement. In order for the notice requirement to be meaningful, it must be the case that the franchisor, defending a PMPA action, not assert new reasons for the termination in court; the defendant must establish that the termination was proper under the PMPA based on the rea-

---

However, in light of our finding that O'Shea's termination was proper under § 2802(b)(2)(B), we need not address this issue.

**14.** Although O'Shea has contested Amoco's claim that he was closed at the relevant time on July 4, *see* Complaint at 3, JA at 5, O'Shea has never contested that he was closed at 11:45 on

June 22, 1987. However, at that time the state court restraint prohibiting Amoco from enforcing the 24–hour provision of the contract was in force. *See* Order to Show Cause with Restraints (Super.Ct.N.J. June 4, 1987), JA 33. Therefore, O'Shea was not in breach of his contract for being closed on June 22.

sons that it gave to the franchisee in the notice of termination.

■ Consequently, the question whether Amoco was required to prove that O'Shea was closed at 11:58 on July 4 is reduced to the question whether O'Shea was notified that he was being terminated for failing to comply with the 24–hour provision of the agreement generally, or whether he was notified that he was being terminated because he was closed at 11:58 pm on July 4. Although the letter of notification is not unambiguous, we believe that the better reading of the letter is that Amoco was notifying O'Shea that he was being terminated for non-compliance with the 24–hour provision generally, and that June 22 and July 4 were listed as examples.

Amoco had previously written to O'Shea about, and the parties had discussed, Amoco's insistence that O'Shea remain open for 24 hours a day. Given that O'Shea knew about Amoco's concern previously, he should have known, based on the language of the letter, that Amoco's objection was not that he was not open at a particular time on a particular night, but that he had refused to resume 24–hour service generally. Therefore, it was not incumbent upon Amoco to prove that O'Shea's station was not open on July 4 at 11:58 pm. Instead, Amoco had merely to prove that O'Shea had not been complying with the 24–hour provision of the contract generally. As noted above, Amoco met that burden, and O'Shea has never contended otherwise.

The judgment of the district court will be affirmed.