### N.I. PETROLEUM VENTURES CORPORATION, Plaintiff,

v.

### GLES, INC. t/a Sweet Oil Company, Defendant.

### No. CIV. 04–273–SLR.

United States District Court,
D. Delaware.

Aug. 27, 2004.

---

Neil R. Lapinski, Esquire of Swartz Campbell LLC, Wilmington, DE, Counsel for Plaintiff.

Daniel P. Johnson, Esquire and Seth J. Reidenberg, Esquire of Young Conway Stargatt & Taylor, LLP, Wilmington, DE, Counsel for Defendant.

## MEMORANDUM OPINION

ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiff N.I Petroleum Ventures Corporation, trading under the name Concord Pike, B.P., filed the present action on April 30, 2004, pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq., to enjoin defendant GleS, Inc., trading under the name Sweet Oil Company, from not renewing a lease and supply agreement between plaintiffs and defendant for an automobile fuel station located in Wilmington, Delaware.[1]  (D.I.1)

In conjunction with filing the complaint, plaintiff also filed a motion for a temporary restraining order until the request for a preliminary injunction could be considered. (D.I.3) A teleconference was held on April 30, 2004, during which the parties agreed to maintain the status quo pending resolution of the case by the court.  (D.I.9) An order to that effect was entered on May 3, 2004.[2]

On May 7, 2004, defendant filed a motion to dismiss the complaint and for sanctions.[3]  (D.I.15) Defendant alleged that plaintiff had violated the court's April 30, 2004 order by failing to pay rent owed under the underlying lease agreement. A teleconference was held on May 20, 2004, during which plaintiff conceded that rent had been paid late.  (D.I. 27 at 5) Plaintiff was admonished by the court that future breaches would not be permitted.  (Id. at 7–8)

On June 2, 2004, an evidentiary hearing was conducted with respect to the request for a preliminary injunction.  Post-hearing briefs were filed by the parties.  (D.I.40, 42) The court has jurisdiction over the action pursuant to 15 U.S.C. § 2805 and 28 U.S.C. § 1331.  For the reasons stated, the court will deny plaintiff's request for a preliminary injunction.

## II. FACTUAL BACKGROUND

Defendant is the owner of an automobile fuel station located at 2701 Concord Pike

1. The initial complaint joined as plaintiffs Nabeel M. Baig and Nadia I. Sayed[sic].  (D.I.1) At an evidentiary hearing held on June 2, 2004, the individual defendants voluntarily withdrew from this action.  (D.I. 34 at 9)

2. The agreement between the parties with respect to maintaining the status quo and the court's order thereto moots plaintiff's motion for a temporary restraining order.  (D.I.3)

3. Defendant's motion to dismiss did not state a legal basis for relief, was not filed with a memorandum in support thereof, and its rationale rested only upon plaintiff's breach of the status quo order.  (D.I.15) As defendant failed to state a legal basis for its motion to dismiss, the court will deny that motion without prejudice.

in Wilmington, Delaware (the "fuel station"). (D.I. 34 at 95) In an agreement dated December 22, 2000, defendant and Lorrie Meck, a non-party to this action, entered into a lease for the fuel station and contract for the supply of automobile fuel (the "Agreement"). (*Id.* at 96; D.I. 41, ex. 17) The Agreement was for a term of three years, expiring on December 31, 2003.[4] (D.I.41, ex. 17) On October 3, 2002, Meck assigned, with defendant's consent, her leasehold interest in the Agreement to plaintiff. (D.I. 34 at 92) Fifteen months remained on the original term of the Agreement at the time of assignment. In addition to succeeding to Meck's leasehold interest in the fuel station, plaintiff purchased an improvement to the property, consisting of an automated car wash, and also purchased fuel and retail inventory.

It is undisputed that during plaintiff's operation of the fuel station, sales faltered.[5] In 2001, plaintiff's predecessor in interest purchased 1,258,354 gallons of fuel from defendant. (D.I.41, ex. 12) In 2002, a total of 1,005,560 gallons of fuel were purchased from defendant. (*Id.*) In 2003, plaintiff purchased only 711,773 gallons of fuel from defendant. (*Id.*) Comparing the sales data between 2001, the year before plaintiff purchased the lease, and 2003, the first full year that plaintiff operated the fuel station, average monthly fuel purchases dropped by 45,548 gallons a month, or nearly 43%.

On October 31, 2003, defendant sent notice of its intent to not renew the Agreement to plaintiff ("October 2003 notice"). (D.I.41, ex. 18) The October 2003 notice stated two bases for nonrenewal:

(a) Rendering franchise operations uneconomical by continuous motor fuel product run outs and impacting [defendant's] ability to meet allocation requirements.

(b) Noncompliance with branded image standards.

(*Id.*) The October 2003 notice also indicated that defendant wished to renew the Agreement if contract violations and operational deficiencies could be remedied to its satisfaction. (*Id.*)

On November 11, 2003, defendant's representative Shawn Sorrel met with plaintiff's representative Ibrahim Syed to discuss the October 2003 notice, the concerns raised therein, and other issues. (D.I. 34 at 109) At that November 11 meeting, Sorrel and Syed discussed the following deficiencies: (1) failure to maintain adequate daily fuel inventory; (2) failure of plaintiff's employees to wear uniforms; (3) cleanliness of the station; (4) failure to meet plaintiff's minimum annual fuel order requirements; and (5) failure to provide timely fuel tank reconciliations. (*Id.* at 109–10) Following the meeting, Syed agreed to submit a business plan to defendant to address these issues. (*Id.* at 113)

In a handwritten memorandum dated November 30, 2003, Syed submitted plaintiff's response to the issues raised at the November 11 meeting. (D.I.41, ex. 19) The memorandum suggested the following ideas to promote sales at the station: (1) to accept a fleet car credit program; (2) to offer diesel fuel; (3) to offer free coffee to customers; (4) to reward customers with movie tickets; (5) to offer discounts on car washes; (6) to offer free sodas for custom-

---

4. At the time the Agreement was entered into, defendant's fuel stations operated under the Amoco brand name. Since Amoco's acquisition by British Petroleum, defendant's fuel stations operate under the BP brand name.

5. The parties also agree that the drop in sales is substantially related to the high retail price of fuel charged at the fuel station. The parties disagree, however, as to why that retail price is higher than nearby competitors.

ers; (7) to enforce an employee uniform policy; and (8) to offer special customer assistance to elderly and disabled customers. (*Id.*)

After receiving plaintiff's memorandum, defendant concluded that plaintiff's suggestions did not adequately respond to defendant's concerns, in particular the problem of fuel run outs. Defendant's decision was communicated by telephone after receipt of the memorandum and prior to the Agreement's expiration on December 31, 2004. (D.I. 34 at 112–13)

Defendant subsequently offered a four month extension to plaintiff, until April 30, 2004, permitting plaintiff the opportunity to vacate the property and sell any of plaintiff's property still at the location. (D.I. 34 at 113) Plaintiff did not accept defendant's offer and continued to occupy the station on a month-to-month basis as a holdover tenant. (D.I. 41, ex. B at 29–30)

On January 30, 2004, defendant issued a second notice of nonrenewal and informed plaintiff that it must surrender possession by April 30, 2004 ("January 2004 notice"). (D.I.41, ex. 20) The reasons stated in the January 2004 notice were identical to the reasons previously set forth in the October 2003 notice. Plaintiff remains a holdover tenant.

## III. STANDARD OF REVIEW

The sole issue before the court is whether to grant plaintiff's request for preliminary injunctive relief. (D.I.1) Neither party has moved for summary judgment and, consequently, the court does not decide the ultimate merits raised in plaintiff's complaint.[6]

In *St. Thomas–St. John Hotel & Tourism Ass'n. Inc. v. Government of U.S. Virgin Islands ex rel. Virgin Islands Dept. of Labor*, 357 F.3d 297, 301 (3d Cir.2004), the Third Circuit stated: .

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*Id.*

The PMPA provides a lower threshold for obtaining preliminary injunctive relief than ordinarily permitted under the Federal Rules of Civil Procedure. *See, e.g., Brownstein v. Arco Petroleum Products Co.*, 604 F.Supp. 312, 314 (E.D.Pa.1985). First, the plaintiff must show that it is a franchisee under a covered franchise agreement which has been terminated or not renewed. 15 U.S.C. § 2805(b)(2). Second, the plaintiff must show that there are "serious questions going to the merits to make such questions a fair ground for litigation." *Id.* Finally, the court must balance the "hardships imposed upon the franchisor by the issuance of such preliminary relief" against "the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not

6. The court also notes that neither party in their post-hearing briefs articulated the standard of review to be applied. (D.I.40, 42) Moreover, plaintiff's brief failed to comport to the standards for court memoranda required by Local Rule 7.1.3, leaving the court without a clear guide as to the relief plaintiff seeks.

granted." *Id.* Finally, the court may decline to grant equitable relief where a franchisee has delayed more than 180 days from first receiving notice under § 2804(b)(2) of the franchisor's intent to not renew or terminate. 15 U.S.C. § 2805(b)(4)(B).

In a civil action brought pursuant to the PMPA, the franchisee has the burden of establishing that the franchise relationship was either terminated or not renewed; the franchisor has the burden of production to establish, as an affirmative defense, that the termination or nonrenewal was permissible under the Act. 15 U.S.C. § 2805(c).

In the case at bar, the parties have stipulated that plaintiff is a franchisee and that the franchise relationship has not been renewed. As a consequence, there are two issues before the court: (1) whether there are serious issues going to the merits of the litigation relating to whether defendant's nonrenewal was permissible under the PMPA; and (2) whether, under the PMPA's balancing test, plaintiff is entitled to preliminary injunctive relief.

## IV. DISCUSSION

### A. The PMPA

In 1978, Congress enacted the PMPA to address the apparent disparity of bargaining power that exists between franchisors and franchisees in the automobile fuel distribution and retail industries. *See O'Shea v. Amoco Oil Co.*, 886 F.2d 584 (3d Cir. 1989); *Rodgers v. Sun Refining and Marketing Co.*, 772 F.2d 1154 (3d Cir.1985); *Lugar v. Texaco, Inc.*, 755 F.2d 53 (3d Cir.1985); *Sun Refining and Marketing Co. v. Rago*, 741 F.2d 670 (3d Cir.1984). Under the PMPA, a franchisor's ability either to terminate or not to renew a covered franchise agreement is restricted to certain statutory proscribed grounds. 15 U.S.C. § 2802. Prior to termination or nonrenewal, a franchisee is entitled to adequate notice of the franchisor's intent.

■ Consistent with its remedial purpose, the PMPA creates a private right of action in federal court for a franchisee to challenge a franchisor's decision to terminate or not renew. 15 U.S.C. § 2805. Upon filing a complaint, a franchisee may obtain preliminary injunctive relief upon an evidentiary showing that is substantially less than ordinarily required for preliminary relief. *Id.*

### 1. Statutory Grounds for Termination or Nonrenewal

Section 2802(b)(2) provides the exclusive bases for which a franchisor may lawfully terminate or not renew a covered franchise agreement. The first basis for termination or nonrenewal is if there is a "failure by the franchisee to comply with any provision of the franchise, which ... is both reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A). A termination or nonrenewal under this subsection does not require that the franchisee be given the opportunity to cure.

The PMPA does not provide an express definition of "material." 15 U.S.C. § 2801. The PMPA does, however, define "failure" to not include any failure which is "technical or unimportant to the franchise relationship," "beyond the reasonable control of the franchisee," or invalid under state law grounds. 15 U.S.C. § 2801(13). The Third Circuit's materiality test, relying upon the statutory definition of failure, inquires whether it is a nontechnical contract requirement and whether it is a "significant substantive requirement relating to the way the franchisee must run [the] business." *See O'Shea*, 886 F.2d at 595 n. 11.

The second basis for termination or nonrenewal provides that a "failure by the

franchisee to exert good faith efforts to carry out the provisions of the franchise if . . . the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonably opportunity to exert good faith efforts to carry out such provisions." 15 U.S.C. § 2802(b)(2)(B). Although not expressly stated in the statute, the Third Circuit has concluded that, because of the statutory definition of failure, a materiality test also applies to terminations or nonrenewal under this subsection.[7] See O'Shea, 886 F.2d at 595 n. 11.

The third basis for termination or nonrenewal is if there is an "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(C). Most of these statutorily defined "events" relate to circumstances not directly flowing from the franchise agreement itself but nonetheless substantially impacting the position of the parties.[8]

### 2. PMPA Notice Requirements

■■■ A franchisor seeking to terminate or not to renew a franchise agreement must provide notice to the franchisee in strict compliance with the PMPA. See O'Shea, 886 F.2d at 597–98. Specifically, the notice must be in writing and personally delivered or sent by certified mail to the franchisee. 15 U.S.C. § 2804(c)(3)(A). The notice must state the intent to terminate, the reasons therefore, the date the termination or nonrenewal will take effect, and be accompanied by a summary of the PMPA. 15 U.S.C. § 2804(c)(3)(A). The Third Circuit mandates that a franchisor may not defend a termination or nonrenewal with reasons not disclosed in the notice letter. See O'Shea, 886 F.2d at 597–98.

### B. Defendant's Stated Grounds For Nonrenewal of the Franchise Agreement

In the October 2003 notice, defendant stated that its reasons for nonrenewal were because plaintiff had "render[ed] franchise operations uneconomical by continuous motor fuel product run outs and impacting [defendant's] ability to meet allocation requirements," and because plaintiff did not comply "with branded image

7. The Third Circuit characterizes §§ 2802(b)(2)(A) and (B) as "complementary." O'Shea, 886 F.2d at 595. The first, § 2802(b)(2)(A), permits termination or nonrenewal without giving the franchisee the opportunity to cure, so long as the basis is both material and reasonable. The second, § 2802(b)(2)(B), provides for termination or nonrenewal so long as a franchisee, having been given notice of a contractual failure, exercises good faith efforts to cure such failure. The critical difference, therefore, is that where the franchisee is given an opportunity to cure, the court need not inquire into the reasonableness of the contract provision, only its materiality. See id.

8. An "event," within the meaning of this subsection, includes: (1) fraud or criminal misconduct by the franchisee; (2) bankruptcy or insolvency by the franchisee; (3) debilitating physical or mental disability; (4) loss of the franchisor's right to possess or lease the marketing premises; (5) condemnation of the premises; (6) franchisor's loss of rights to use the trademark which is subject to the franchise; (7) destruction of the premises; (8) failure to pay in a timely manner when due all sums to which franchisor is lawfully entitled; (9) failure by franchisee to operate the premises for seven consecutive days or a lesser period which constitutes an unreasonable period; (10) willful adulteration, mislabeling or misbranding fuels or other trademark violations by franchisee; (11) knowing failure to comply with applicable laws and regulations relevant to operating the premises; and (12) conviction of the franchisee of any felony involving moral turpitude. 15 U.S.C. § 2802(c).

standards." (D.I.41, ex. 18) The December 2003 notice reiterated these identical grounds. (D.I.41, ex. 20)

In its post-hearing brief, however, defendant contends it has four grounds for not renewing its franchise agreement with plaintiff, including: (1) failure to meet minimum annual order requirements; (2) failure to have fuel to sell; (3) failure to wear uniforms; and (4) failure to pay rent on time in May and June of 2004. (D.I.40)

As the Third Circuit strictly construes the PMPA notice requirements, defendant may not rely upon grounds for nonrenewal which are not disclosed in its two notices of nonrenewal. See *O'Shea*, 886 F.2d at 597–98.

### 1. Failure to Meet Minimum Annual Order Requirements

■ Defendant's first basis for nonrenewal is that plaintiff failed to meet the contractually required minimum annual fuel order requirement of 1,000,000 gallons of fuel. It is not disputed that plaintiff failed to purchase 1,000,000 gallons of fuel in 2003. Defendant contends that nonrenewal is permissible under § 2802(b)(2)(A), as the minimum annual order requirement is both material and reasonable. The court concludes, however, that nonrenewal is not permissible in the present case because of defendant's failure to comply strictly with the notice requirement and defendant's failure to exercise its contractually provided remedies.

First, the court finds that defendant did not state in its nonrenewal notices that plaintiff's failure to meet minimum fuel order requirements was an asserted basis for nonrenewal. In both notices, defendant stated that the reason for nonrenewal was that plaintiff had "[r]ender[ed] franchise operations uneconomical by continuous motor fuel run product run outs and impact[ed] [defendant's] ability to meet allocation requirements." (D.I.41, exs.18, 20) This statement in the nonrenewal notice makes three assertions: (1) franchise operations had become uneconomical;[9] (2) motor fuel product run outs had occurred; and (3) defendant's fuel allocation requirements were affected.[10] It is not apparent from the notice, however, that plaintiff had not met or could not meet a minimum annual order contract provision and that defendant was not renewing on that basis.[11] The fuel allocation requirement referred to in the nonrenewal notice specifically relates to defendant's allocation requirements, not plaintiff's. Consequently, the court finds that defendant failed to give proper notice under the PMPA of its intent to not renew based upon failure to meet the minimum annual fuel order requirement.

Second, even if defendant's nonrenewal notices had included plaintiff's failure to meet minimum fuel allocation, it would not be a permissible basis for nonrenewal under § 2802(b)(2)(A). Paragraph 15(d) of the Agreement states:

9. The court notes that, although defendant stated in its notice that it was not renewing because the franchise had become uneconomical, defendant has not argued that it is relying upon that provision of the PMPA relating to uneconomical operations, which has a specific standard to be met. See 15 U.S.C. § 2902(b)(2)(D).

10. Other than preceding under § 2802(b)(2)(D), it is not clear that defen-

dant's extraneous contractual obligations with third parties are grounds for nonrenewal with plaintiff.

11. The record suggests that, when Sorrel and Syed met in November 2003, their discussion did focus on increasing sales at the fuel station. Regardless, the PMPA's written notice requirement is to be strictly construed. See *O'Shea*, 886 F.2d at 597–98.

Providing there are no purchase limitations caused by governmental requirements or availability of products, and [plaintiff] does not purchase a minimum of 1,000,000 gallons of motor fuel per year from [defendant] under this Agreement, [plaintiff] will pay to [defendant] a sum of $0.15 per gallon below said minimum.

(D.I. 41, ex. 17 at ¶ 15(d)) Defendant argues that it is "in the business of selling gasoline to its franchises" and, therefore, this provision should be construed as reasonable and materially significant to the franchise relationship. (D.I. 40 at 9) Under *O'Shea*, a contract term is material if it is nontechnical and represents a significant and substantive requirement relating to the way the franchisee must operate the business. *O'Shea*, 886 F.2d at 595 n. 11.

The franchise relationship at issue in the present case is prototypical. Plaintiff leases the fuel station property from defendant. Plaintiff is obligated to purchase a minimum amount of fuel from defendant, may only purchase fuel from defendant, and defendant has exclusive control over the price of fuel it charges plaintiff. Congress, when it enacted the PMPA, did so in recognition of the fact that this type of franchise relationship resulted in inequitable bargaining positions between franchisors and franchisees. *See Lugar*, 755 F.2d at 54. *See generally* S.Rep. No. 731, 95th Cong., 2d Sess. 1, 17, *reprinted in* 1978 U.S.C.C.A.N. 873, 875. A minimum fuel purchase requirement may relate to the essence of a franchise relationship, as a franchisor, in leasing its property to a franchisee to operate, may want assurance that the property's value is maximized. A minimum fuel purchase requirement also may be materially significant to the extent that a franchisor has independent contractual obligations to purchase fuel from its own suppliers.[12]

In the case at bar, however, defendant's argument is undermined by the language of the Agreement. It is relevant that the minimum sales quota is not included among the material conditions of the franchise relationship enumerated in paragraph 14. (D.I. 41, ex. 17 at ¶ 14) Paragraph 14 illustrates that at the time of contracting, the parties identified and agreed to certain conditions which were material to the relationship. The minimum order requirement, however, is contained in a separate section which relates to indemnification and surety. (*Id.*) Had the parties included the minimum sales requirement among the other enumerated material conditions of the franchise relationship, such inclusion might not be dispositive under § 2802(b)(2)(A), but the failure to do so is informative. Its purpose is to insure that the supply contract will generate adequate minimum profit for the franchisor. While a minimum order requirement is important to a franchisor, its purpose does not relate to the way the franchisee must operate the business and, therefore, does not satisfy the test for materiality.[13] *See O'Shea*, 886 F.2d at 595 n. 11.

Additionally, the provision of the Agreement at issue provides an express contractual remedy in the event plaintiff fails to satisfy the minimum fuel order requirement. In the event plaintiff orders less

---

12. Defendant alleges that it has contractual obligations which are impacted by plaintiff, but it has not shown evidence to demonstrate either the existence of such obligations or that such obligations have been impacted by plaintiff.

13. Even if the court were to conclude that this provision satisfied the materiality requirement, defendant has put forward insufficient evidence for the court to conclude that the 1,000,000 gallon requirement is a reasonable requirement.

than 1,000,000 gallons of fuel, defendant is entitled to receive from plaintiff $0.015 per gallon below the quota. Congress expressed a clear preference for the use of ordinary contract remedies, rather than termination or nonrenewal, to address franchisee breaches.[14] There is no indication that defendant ever sought to avail itself of its contractual remedy for plaintiff's default. Accordingly, to permit defendant to not renew the Agreement where another express remedy is present, would be inconsistent with the PMPA's remedial purpose.

Defendant relies upon an early PMPA case to support its argument that nonrenewal is appropriate. *See Malone v. Crown Central Petroleum Corp.*, 474 F.Supp. 306 (D.Md.1979). In *Malone*, the franchise agreement contained detailed requirements concerning the minimum gasoline sales and it was directly related to the franchisor's express marketing strategy of volume sales. The contract in *Malone*, which was drafted prior to enactment of the PMPA, expressly contemplated termination in the event the franchisee failed to meet the minimum sales requirements. Consequently, that court's finding that minimum sales were material and reasonable with respect to the franchise relationship had an express basis in the contract.

In the case at bar, the Agreement also provides an express remedy, namely, financial compensation to defendant for sales below the million gallon benchmark. As the parties have already contractually bargained for the contingency of plaintiff's failure to meet minimum fuel order re-quirements, defendant's contention that it is entitled to not renew on that basis is unpersuasive. Consequently, the court finds that defendant may not rely upon plaintiff's failure to meet minimum fuel purchase requirements as a basis for nonrenewal under the Agreement.

### 2. Failure to Have Fuel to Sell

Defendant asserts that plaintiff's failure to have all grades of fuel to sell at all times constitutes grounds for nonrenewal under both §§ 2802(b)(2)(A) and (C). In its October 2003 and December 2003 nonrenewal notices, defendant specifically indicated that fuel run outs were a basis for nonrenewal. Accordingly, the court finds that defendant did comply with the PMPA's notice requirement with respect to this asserted basis for nonrenewal.

Defendant argues that plaintiff, by not having fuel to sell, was not open for business and, therefore, in violation of paragraph 14(j) of the Agreement which requires plaintiff to operate the business twenty-four hours a day, seven days a week.[15] (D.I.41, ex. 17) Defendant contends that this is a permissible basis for nonrenewal under § 2802(b)(2)(A), as it violates a material and reasonable provision of the franchise relationship.

Congress expressly provided that a franchisee's failure to not be open for business is grounds for nonrenewal or termination under the PMPA. 15 U.S.C. § 2802(c)(9). Under § 2802(c)(9), if the franchisee is closed either for seven consecutive days or for "such lesser period which under the

---

**14.** *See* S.Rep. No. 731, 95th Cong., 2d Sess. 1, 17, *reprinted in* 1978 U.S.C.C.A.N. 873, 876 ("It is important to note that while the relationship of the parties to a motor fuel franchise agreement is basically contractual in nature, normal remedies for violations of contractual provisions are often eschewed by the franchisor.").

**15.** The court notes, however, that defendant's nonrenewal notices did not expressly characterize its nonrenewal as relating to the hours of operation requirement. (D.I.41, exs.18, 20) Instead, the notices characterize the fuel run outs as rendering the operations "uneconomical" and impacting defendant's own allocation requirements. (*Id.*)

facts and circumstances constitutes an unreasonable period of time," an event relevant to the franchise relationship has occurred and termination or nonrenewal may be permissible. *Id.* Defendant, however, has not asserted §§ 2802(b)(2)(C) and 2802(c)(9) as its basis for nonrenewal; instead it relies on § 2802(b)(2)(A).[16] Defendant's reliance is misplaced.

■ Defendant's argument circumvents the plain language of § 2802(c)(9), which limits the ground upon which a franchisor may terminate or not renew a franchise based upon hours of operation. To conclude otherwise would contravene Congress's clear intent. *See e.g., Lyons v. Mobil Oil Corp.*, 526 F.Supp. 961 (D.Conn. 1981) (concluding that a franchise agreement could not be construed to "overcome the clear intent of Congress."). If a franchisor seeks to terminate or not renew based upon a franchisee's noncompliance with store operating hour requirements, it must do so under § 2802(c)(9) by demonstrating either that plaintiff was not open for seven consecutive days or for a lesser period which constitutes an unreasonable period of time.[17]

■ Defendant next argues that failure to have fuel to sell is a permissible basis for termination or nonrenewal under § 2802(b)(2)(C). The Third Circuit has concluded that a franchisee's failure to have fuel available for sale may be a basis for termination or nonrenewal under § 2802(b)(2)(C). *Rodgers v. Sun Refining and Marketing Co.*, 772 F.2d 1154, 1157

(3d Cir.1985). In *Rodgers*, the franchisee ran out of fuel twenty times during a period just over two years. The franchisor warned the franchisee that two more fuel run outs during a ninety day period would be a cause for termination. The franchisee continued to run out of fuel despite that notice. The Court of Appeals concluded that termination of the franchise was permissible under § 2802(b)(2)(C), if the franchisee's failure to maintain adequate fuel supplies is an event relevant to the franchise relationship and if nonrenewal or termination is reasonable. *Id.* The Court of Appeals, however, did not disturb the district court's finding that nonrenewal was impermissible under § 2802(b)(2)(A). *Id.*

In the case at bar, the court finds that, while defendant has stated a proper basis for nonrenewal under § 2802(b)(2)(C), there are issues for litigation as to the frequency with which plaintiff actually experienced fuel run outs.[18] As the PMPA permits a franchisor to rely only upon events that transpired in the 120 days prior to notice being given to the franchisee, the court is limited to considering fuel run outs that occurred between July 3, 2003 and October 30, 2003. Any fuel run outs that occurred prior to July 3, 2003 are not a factor in determining whether a breach has occurred.

Defendant's assistant business manager testified that he could determine whether plaintiff experienced fuel run outs by re-

---

**16.** Defendant did not give notice that it intended to rely upon §§ 2802(b)(2)(C) and 28202(c)(9) as its basis for not renewing.

**17.** An express franchise agreement provision concerning operating hours may, of course, be evidence of whether the franchisee's failure was unreasonable under § 2802(c)(9)(B).

**18.** The frequency with which fuel run outs occurred is relevant to whether plaintiff's

breach was material. A single run out, for example, may only be a technical breach and not a basis for nonrenewal. Moreover, if the fuel run outs were attributable to conditions outside plaintiff's control, including weather, defendant's untimely delivery, etc., these may not be failures within the meaning of the PMPA. *See* 15 U.S.C. § 2801(13).

viewing daily inventory reports.[19] (D.I. 41, ex. A at 11–12) According to the assistant business manager, if the records indicated less than a certain level of fuel in a tank, the pumps would not be able to remove fuel from that tank.[20] (Id. at 12) In addition to the computerized system, the assistant business manager maintained a spreadsheet which detailed when fuel run outs were reported to him.[21] (Id. at 14–15; Id., ex. 1)

According to the inventory records for this 120 day period, plaintiff was below the minimum level of premium grade fuel on 10 out of the 120 days; below the minimum level for mid-grade fuel on 12 of the 120 days; and below the minimum level for regular grade fuel on 3 of the 120 days. (D.I. 41, ex. A at 18–22) At no time do the records indicate that plaintiff was below the minimum fuel level in all three grades of fuel at the same time. On five occasions, plaintiff was below the minimum fuel level for two of the three fuel grades. (D.I. 41, ex. A at 18–22) In total, defendant's records indicate that plaintiff did not have at least one grade of fuel to sell on 20 out of the 120 days preceding the October 2003 notice.

Syed, plaintiff's primary employee, testified regarding the fuel inventory reconciliation records he submitted to defendant. (D.I. 41, ex. A at 223–24; Id., exs. 1–11)

These reconciliation records were based upon computerized reports from the Veeder Root computer system, which measures the level of fuel in the tanks and his cash register reports. (Id., ex. A at 224) The computer reports were generated each evening at 11:00 PM. Syed testified that when the computerized measurement system reported less than 350 gallons in the tank, fuel could still be pumped from the fuel tanks. (Id. at 225) Syed testified that the computerized fuel measurement system would often be off by 200 to 400 gallons. (Id. at 226) Prior to October 31, 2003, Syed reported that the fuel station was never completely out of all grades of fuel. (Id. at 237)

In the case at bar, there are disputed issues of fact as to the number of occasions that plaintiff actually ran out of fuel such that it was unable to provide fuel to its customers. In particular, defendant primarily relied on the testimony of its employee who admittedly has no personal knowledge as to whether plaintiff ever actually had no fuel to sell and who admitted to being largely unfamiliar with the process of measuring fuel inventory. Further, according to the testimony at the hearing, the computerized system reports when fuel in the tanks falls below a certain level, but this level is not zero. There is disputed fact as whether this is an accu-

19. Defendant's assistant business manager testified that he was not personally familiar with the computerized system that measured the fuel in the tanks. (D.I. 41, ex. A at 29) He also testified that prior to October 31, 2003, he never reviewed the inventory records to determine whether fuel run outs had occurred. The assistant business manager also stated that he was personally unfamiliar with the method of physically measuring the fuel tank levels, known as "sticking" the tank. (Id. at 29)

20. With respect to the regular grade of fuel, this level was 642 gallons, for mid-grade and premium the tanks would stop delivering gas when the tanks fell below 350 gallons. (Id. at 12–13)

21. According to defendant's assistant business manager, the fuel station was reported to be out of at least one grade of fuel on two occasions during the relevant 120 time period. (Id.) The spreadsheet, however, is based at least in part upon statements by individuals who did not testify, have not submitted sworn affidavits or have not been deposed. (Id. at 41) Consequently, such evidence is hearsay and is not admissible for the purpose of proving plaintiff ran out of fuel.

rate method for determining whether plaintiff was unable to sell fuel. Finally, there are also disputed issues of fact as whether individual fuel run outs are attributable to plaintiff's actions or that of factors outside its control. Consequently, the court finds that there are serious disputed issues for litigation pertaining to whether plaintiff maintained adequate supplies of fuel consistent with its obligations under the Agreement.

### 3. Failure to Wear Uniforms

■ Defendant asserted both in its notices to plaintiff and in its briefing to the court that plaintiff's failure to have its employees wear uniforms with the branded logo was a basis for its nonrenewal. Defendant's argument is without merit.

The wearing of uniforms or, as defendant described in its notice letters, compliance with "branded image standards," is not a statutory basis for nonrenewal. It also is not an express provision of the Agreement itself. Defendant's argument is weakened by the fact that the Agreement does indicate eleven specific events which are materially significant to the franchise agreement. (D.I. 41, ex. 17 at ¶ 14)

Restricting a franchisor's ability to terminate or not renew based upon a franchisee' failure to comply with extra-contractual marketing policies was the express intent of Congress. *See* S Rep. No. 731, 95th Cong., 2d Sess. 14, *reprinted at* 1978 U.S.C.C.A.N. 873, 874. Consequently, the court cannot conclude that wearing of uniforms was of material significance to the franchise relationship.

### 4. Failure to Pay Rent on Time

■ In its post-hearing brief, defendant contends that plaintiff failed to pay May 2004 and June 2004 rent on a timely basis and that this provides grounds for nonrenewal. Failure to pay rent is a basis for nonrenewal under § 2802(b)(2)(C).[22]

Pursuant to the Agreement, amounts due by plaintiff are paid via electronic funds transfer ("EFT"). (D.I. 41, ex. 17 at ¶ 3) An untimely payment will result when plaintiff has insufficient funds in its account to cover an EFT request initiated by defendant. (D.I. 27 at 5) Rent is payable on the last banking day of the month preceding the month due.

With respect to the May 2004 rent, plaintiff explained that it had funds to cover the amount owed, but removed those funds from its account. (D.I. 27 at 4) It did so because it did not want to pay May 2004 rent if the court did not grant its April 30 request for a TRO. (*Id.*) On May 4, 2004, defendant initiated an EFT for the amount owed under the lease, but the EFT was rejected for insufficient funds. (D.I. 15 at ¶.7) Plaintiff did not replace the funds it removed from the account until May 7. (D.I. 27 at 4) Also in May, plaintiff failed to make available sufficient funds for amounts owed for the delivery of fuel by defendant. (D.I. 27 at 5)

June 2004 rent was also paid on an untimely basis. (D.I.33) Plaintiff asserts that it did not learn that the June 2004 rent had not been paid until June 3, 2004, the day after the evidentiary hearing. (D.I. 42 at 22) Although plaintiff explains this delay as the result of changing financial institutions three days before the EFT was due and clerical mistakes made in relaying that information to defendant, the

---

**22.** It is not, however, a "per se reasonable basis" as defendant argues. (D.I. 40 at 23) In *Rago*, the Third Circuit concluded that the events listed in § 2802(c) are not per se reasonable bases for nonrenewal or termination. *See Rago*, 741 F.2d at 673.

bottom line remains that June rent was not paid on time. (D.I. 42 at 22) As of June 8, 2004, rent had not yet been paid by plaintiff.[23] (D.I.33)

Plaintiff's failure to pay rent, however, occurred after defendant gave notice of its intent to not renew. There is no evidence in the record that plaintiff was ever delinquent prior to defendant's decision to not renew the Agreement. Consistent with the Third Circuit's decision in *O'Shea,* as plaintiff's untimely payment of rent occurred after defendant's decision to not renew was made, the court finds that plaintiff's failure to pay rent on time in May and June 2004 is not a legal basis for defendant's October 2003 decision to not renew. *See O'Shea* 886 F.2d at 597–98. If defendant seeks to terminate on these grounds, it must comply with the PMPA notice requirements.[24]

### C. Balancing of Hardships

■ Having found that there are serious disputed issues relating to the appropriateness of defendant's nonrenewal of the Agreement, § 2805(b)(2)(b) requires the court to perform a balancing test analysis to determine whether preliminary equitable relief is warranted. There is a statutory presumption favoring preliminary injunctive relief.

The hardship to plaintiff is that a denial of this preliminary injunction will likely result in defendant's proceeding with its state law remedies as a landlord for eviction. Congress, in enacting the PMPA, was mindful of the risk of serious economic harm to franchisees in these circumstances.

Conversely, defendant also faces the risk of economic losses stemming from plaintiff's poor operation of the fuel station and failure to meet its fuel ordering obligations. Further, there is a serious issue as to whether plaintiff will have difficulty meeting its financial obligations to defendant.

The court's balancing of hardships is further informed by § 2805(b)(4)(B), which provides that equitable relief need not be granted where a franchisee has delayed more than 180 days in bringing suit. In the case at bar, plaintiff filed suit 182 days after it first received notice of defendant's intent to not renew the Agreement. Plaintiff did not take action until literally the eve of its threatened date of eviction on April 30, 2004. At the time it filed the present action, plaintiff had been a holdover tenant for four months.

The court also gives substantial weight to the fact that plaintiff has twice breached the Agreement and, consequently, twice violated the court's status quo order since filing suit. On April 30, 2004, in a teleconference with the court, the parties each agreed to maintain the status quo and perform all obligations under the Agreement. Of paramount concern to defendant was that it would be timely paid. Nevertheless, plaintiff delayed paying its May rent for several days. It also delayed in paying for fuel delivered to it. A second teleconference was held and plaintiff was granted one final opportunity to comply strictly with its obligations under the Agreement. In June, right after the court's hearing on this matter was held,

---

**23.** It is unclear whether the June 2004 rent has been paid, although the court will presume that defendant would have informed the court if the account remained delinquent.

**24.** As defendant has not posited that it has given notice under the statute on these grounds, the court does not decide whether subsequent correspondence during the course of litigation may satisfy the statutory requirements.

plaintiff again failed to pay timely the amounts it owed under the Agreement.

It is a basic maxim that one who seeks equity must do equity. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Where, as here, the extraordinary relief of a preliminary injunction is sought to compel continuation of a contract, plaintiff's failure to pay rent on time cannot be overlooked. *See, e.g., Walters v. Chevron U.S. A., Inc.,* 476 F.Supp. 353, 357 (N.D.Ga.1979) (denying injunction where franchisee delayed in filing complaint and continued to not comply with franchise agreement requirements). Consequently, exercising its discretion under the PMPA, the court will deny plaintiff's request for preliminary injunctive relief.

### V. CONCLUSION

For the reasons stated above, plaintiff's request for preliminary injunctive relief is denied.