**EQUILON ENTERPRISES, L.L.C.,
Plaintiff–Appellee,**

v.

**RAHIM, INC., et al., Defendants–
Appellants.**

**Nos. 01–2143, 01–2281.**

United States Court of Appeals,
Sixth Circuit.

Nov. 7, 2003.

---

464

Kathleen McCree Lewis, Bonnie L. Mayfield, Detroit, MI, for Plaintiff–Appellee.

Jamal J. Hamood, Michael J. Fergestrom, Hamood & Fergestrom, Troy, MI, for Defendants–Appellants.

Before BOGGS, Chief Circuit Judge, DAUGHTREY, Circuit Judge, and OBERDORFER,* Senior District Judge.

---

\* The Hon. Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

PER CURIAM.

Rahim, Inc. ("Rahim"), owner and operator of a Shell Oil gasoline station franchise, filed suit against Equilon Enterprises, L.L.C. ("Equilon"), an affiliate of Shell Oil, after Equilon terminated the franchise relationship. Rahim alleged that the termination violated the Petroleum Marketing Practices Act ("the PMPA"), 15 U.S.C. § 2801 *et seq.*, and also constituted breach of contract and tortious interference with contract and business expectancy. In a separate action, Equilon sued Rahim to recover payments owed to it. The district court granted summary judgment in favor of Equilon on Rahim's claims, and awarded Equilon a money judgment in the amount it claimed from Rahim. For the reasons that follow, we affirm the judgment of the district court.

### FACTUAL AND PROCEDURAL BACKGROUND

In January 1996, Amila Issa ("Issa"), principal of Rahim, purchased a Shell gasoline station franchise in Detroit, Michigan. As part of this transaction, the previous owners assigned to Rahim a Dealer Agreement and a Lease with Shell Oil Company. Pursuant to the Dealer Agreement, Rahim purchased gasoline from Shell; the Lease provided Rahim its business premises. The contracts expressly allowed Shell to terminate the franchise for several reasons, including Rahim's failure: (i) to operate the station for seven consecutive days; or (ii) to pay Shell in a timely manner.[1]

At the time of the assignment, the Lease contained a premises rent schedule that called for monthly payments in the range of $8,026 to $9,033. Notwithstanding this rent schedule, between early 1996 and 1998, the monthly rent payments were trimmed significantly by Shell's Variable Rent Program ("the Rent Program"), an incentive program under which franchisees received a rebate based upon the amount of gasoline sold. For convenience, the rebate was "paid" by setting it off against the franchisee's rent payment. The Program reduced rent payments to around $3,500 per month.

Issa alleges that before she agreed to purchase the franchise, she specifically discussed with Shell representatives Timothy McCafferty and Wilson Jackson the necessity of the Rent Program to make rent payments feasible for Rahim. She claims that these representatives assured her that the Rent Program would remain in effect indefinitely. Without this assurance, Issa maintains, she would not have purchased the franchise. Both McCafferty and Jackson deny making any such promise to anyone affiliated with Rahim.

These alleged discussions aside, Shell outlined the terms of the Rent Program in a letter to Rahim dated November 25, 1996. In this letter, Shell explained that the Program would continue at Shell's option, could be terminated at any time by Shell, and was not part of Rahim's contracts with Shell. In July 1998, Shell notified its Michigan dealers (including Rahim) by letter that it was discontinuing the Rent Program.

Rahim and Equilon had arranged for the rent payments to be taken directly from Rahim's bank account by electronic transfer. In early 1999, Issa discovered that Equilon had electronically deducted a single-month rent payment of about $9,500,

---

1. On July 1, 1998, Equilon was substituted for Shell in the Lease and Dealer Agreement with Rahim, and succeeded to Shell's right and obligations under those agreements. On January 14, 1999, the Dealer Agreement and Lease, which were to expire March 31, 1999, were extended by Equilon and Rahim, "under the current terms," until December 31, 1999.

instead of the approximately $3,500 that had been charged previously. Issa contacted Equilon, and was told that Rahim would no longer receive credit for the Rent Program. According to Issa, some Equilon representatives attributed the rent increase to Rahim's participation in franchisee litigation being undertaken in Houston, Texas. However, counsel for Equilon indicated that the Houston litigation was first filed in February 1999. The case was removed to federal court in Texas on August 6, 1999.

The parties offer different versions of what transpired after the rent increase. Issa claims she attempted to contact Equilon numerous times to discuss and negotiate the Lease terms. On July 29, 1999, Issa sent a letter on behalf of Rahim, describing the financial difficulties she faced. **By August 1999, Issa no longer had sufficient funds in her bank account to pay the rent**. Issa also claims that she found a buyer for the franchise, but that Equilon refused to entertain the offer. Equilon, on the other hand, claims that Rahim refused to sign a mutual termination, or to work out a payment plan.

As of October 1, 1999, Equilon ceased providing Rahim with any more gasoline. Consequently, the station soon ran out of gasoline and ceased operations. A week later, on October 8, 1999, Equilon advised Issa by letter that, because her station had not been in operation for seven days, and because of a failure to make timely payments, Rahim's Lease and Dealer Agreement were terminated effective immediately. The letter enclosed a copy of Rahim's rights under the PMPA, and stated that termination on such short notice was reasonable in light of the damage to Shell's brand resulting from Rahim's "inability or refusal" to sell gasoline, and also given Equilon's exposure to the risk of further revenue loss.

In November 1999, Equilon installed an interim lease operator at Rahim's station. This suit followed.

*Procedural History*

On November 5, 1999, Equilon filed an action in Michigan state court, seeking to repossess the gas station premises, payment of outstanding amounts owed by Rahim, and a declaration that the franchise relationship was terminated. Three days later, Rahim filed an action in federal district court, asserting claims under the PMPA and supplemental Michigan state law claims. Rahim later removed Equilon's state court action, and the case was placed on the same pretrial schedule in federal court with Rahim's pending action. On February 4, 2000, Equilon filed a counterclaim in the suit filed by Rahim, seeking damages for amounts allegedly owed to it by Rahim.

Following completion of discovery, on August 7, 2000, Equilon filed a Motion to Dismiss and/or for Summary Judgment, and also requested a judgment for damages on its claims for Rahim's alleged indebtedness to Equilon. The district court judge granted summary judgment in favor of Equilon, and issued a terse ruling from the bench:

I believe that despite [counsel's] best and eloquent efforts to the contrary, that this is a matter of law and interpretation of what is, in relevant part, not an ambiguous agreement between the parties. And I believe that the arguments of Equilon in this case and the Court's reading of the contractual obligations which were accepted and adopted by the Defendant corporation did make the [Rent Program] subject to cancellation, nonrenewal, and modification. I believe that and I so rule that there were violations, which included failure to pay in a timely fashion and the closing of the

station for more than seven days and an absence of any fact that Equilon, in any contractual or legal sense, caused the failure to timely pay or the closure of the station. And the Court will therefore grant Equilon's motion for summary judgment....

On July 19, 2001, the District Court entered a judgment awarding Equilon $33,040.33 for "indebtedness under the contracts between the parties" and $3,001.61 against Rahim for "costs." This appeal followed.

## DISCUSSION

A trial court's grant of summary judgment is reviewed *de novo*. *Middleton v. Reynolds Metals Co.*, 963 F.2d 881, 882 (6th Cir.1992). Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there is a genuine issue for trial, the facts and evidence, as well as all reasonable inferences to be drawn from them, must be construed in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether a fact is material is determined with reference to the substantive law applicable to the claims at issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A. Petroleum Marketing Practices Act ("PMPA") Claim

The Petroleum Marketing Practices Act ("PMPA") regulates motor fuel marketing franchises, and sets forth grounds for the termination and non-renewal of those franchises. Rahim contends that the district court erred in granting summary judgment in favor of Equilon on Rahim's PMPA claim. In particular, Rahim claims that Equilon did not have adequate grounds to terminate the franchise relationship, and that Equilon failed to comply with the PMPA's notice requirements.

### 1. Grounds for Termination

Under the PMPA, the franchisor bears the burden of presenting evidence to establish that the termination of the franchise was not in violation of the statute. *PDV Midwest Refining, L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 507 (6th Cir.2002). Two specific grounds for termination are applicable to the present case: "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;" and "failure by the franchisee to operate the marketing premises ... for 7 consecutive days." 15 U.S.C. §§ 2802(c)(8), (c)(9)(A).

It is undisputed that Rahim ceased operations for seven consecutive days, and that its payments to Equilon were seriously past due. Nevertheless, this court "must scrutinize the reasonableness of terminations even when an event enumerated in § 2802(c) has occurred." *Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509, 1512 (6th Cir.1989). Rahim insists that the termination was unreasonable, and alleges that its financial crisis was caused by Equilon's decision to increase the rent. Rahim further alleges that this decision was made in bad faith, suggesting it was triggered by Rahim's participation in franchisee litigation in Houston, Texas.

Rahim's allegations regarding the Houston litigation are unsupported by the sequence of events. The Rent Program was terminated for all Michigan franchises in

July 1998. At oral argument in this case, counsel for Equilon indicated that the Houston litigation was first filed in state court in February 1999. Furthermore, the record reflects that the franchisee litigation in Houston was removed to federal court on August 6, 1999, a date consistent with a February 1999 initial filing. This timeline established that the decision to terminate the Rent Program was not linked to the Houston litigation.

As for whether the abandonment of the Rent Program was itself reasonable, the PMPA affords franchisors considerable deference in making broader financial decisions. *See, e.g., May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir.1989) (although "Congress ... intended strong protection of the interests of franchisees[,] ... in an age of increasing corporate competition, the major petroleum firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers and acquisitions."); *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1220 (7th Cir.1982) (the grounds for termination "are intentionally broad enough to provide to franchisors the flexibility which may be needed to respond to changing market conditions ... [but] not so broad as to deny franchisees meaningful protections from ... discriminatory terminations ....") (citation omitted).

Absent any evidence of bad faith or unreasonableness, Equilon clearly acted within the PMPA in terminating the franchise agreement.

### 2. Sufficiency of Notice

Rahim further alleges that the district court's grant of summary judgment was in error because Equilon failed to comply with the notice requirements in the PMPA.

Equilon sent notice to Rahim by letter that the franchise relationship would be terminated "effective immediately." The PMPA provides, in the normal course, for 90 days' notice of termination or non-renewal of a franchise. *See* 15 U.S.C. § 2804(a). However, "[i]n circumstances in which it would not be reasonable for the franchisor to furnish [90 days'] notification ... such franchisor shall furnish notification to the franchisee affected thereby on the earliest date [that is] reasonably practicable...." 15 U.S.C. § 2804(b)(1)(A).

This court must decide whether it was reasonable under the circumstances for Equilon to furnish less than 90 days' notice. *Marathon Petroleum Co.,* 889 F.2d at 1512; *see also Wisser Company, Inc. v. Mobil Oil Corp.,* 730 F.2d 54, 60 (2d Cir. 1984). Equilon argues that if it had given Rahim 90 days' notice, it would have incurred another three months of lost rent and lost sales. Section 2804(b)(1)(A) has been interpreted to allow franchisors significant latitude when a franchisee has been delinquent in making payments to the franchisor. In such circumstances, a franchisor may provide less than 90 days notice because "requiring [the franchisor] to continue to provide product to [the franchisee] for an additional ninety days would expose [the franchisor] to potential large additional deficiencies for the remainder of the ninety day termination period." *Loomis v. Gulf Oil Corp.,* 567 F.Supp. 591, 597 (M.D.Fla.1983). Given Rahim's untenable claim that it was entitled to a rent discount in perpetuity, and the loss that Equilon had suffered and was likely to face if it continued to provide gasoline to Rahim, no reasonable trier of fact could find that the minimal notice was inappropriate under the circumstances.

### B. Rahim's Breach of Contract Claim

Rahim maintains that there is a genuine issue of material fact as to whether Equilon breached an oral contract when

it discontinued the Rent Program in 1998. Rahim contends that the promise that the Rent Program would continue indefinitely, allegedly made by Equilon representatives in exchange for Rahim's agreement to take over the franchise, constituted an independent oral contract. Rahim has argued, and Equilon has conceded, that the Rent Program was not part of the Lease.[1]

The sole evidence supporting the existence of this oral agreement is an affidavit of Amila Issa, submitted with Rahim's opposition to Equilon's dispositive motion. The affidavit reads in relevant part:

> Before I agreed to purchase the business in 1996, I specifically discussed the amount of the rent and the necessity of the incentive programs to make the effective rent feasible, and I the incentive programs would remain in effect permanently. These representatives included gentlemen named (to the best of my recollection) Tim McPherson and a Mr. Jackson whose first name I am attempting to determine. Without these assurances, I would not have purchased the business.

Timothy McCafferty and Wilson Jackson, the two representatives mentioned, both denied making any such assurance.

A threshold question is whether the integration clause in the Lease and Dealer Agreement, signed by the previous owners of the station, bars consideration of evidence supporting the alleged oral agreement. The integration clause states that the Lease "merges and supersedes all prior representations and agreements, and constitutes the entire contract between Shell and Lessee concerning the subject matter" of the Lease. A similar clause appears in the Dealer Agreement. Under Michigan law, "a contract with a merger clause nullifies all antecedent claims[,] [including] any collateral agreements that were allegedly an inducement for entering into the contract." *UAW–GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411, 418 (1998). Therefore, it would appear that the merger clause nullifies the alleged oral agreement between Rahim and the Equilon representatives, which Issa claims induced her to accept the assignment of the franchise.

Rahim, however, emphasizes that an integration clause serves to bar extrinsic evidence of agreements and promises made *prior to* or *contemporaneously with* an unambiguous written contract containing the integration clause. *American Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 422–23 (6th Cir.1984). The alleged oral agreement at issue was made in 1996, several years after the Lease, and its integration clause, were agreed to by the previous owners. Yet, when Issa consented to the assignment, she subscribed to all of the provisions in the original Lease and Dealer Agreement, including the integration clause. *See, e.g., Hazara Enterprises, Inc. v. Motiva Enterprises, LLC*, 126 F.Supp.2d 1365, 1374 (S.D.Fla.2000) (assignee's assumption of all rights and obligations of the former franchisee "include[d] an obligation to be bound by the

---

1. Although Rahim has advanced varying arguments in support of its breach of contract claim, *see* Appellant's Brief at 33–35, counsel for Rahim relied on the "independent oral contract" theory at oral argument.

    The breach of contract theory advanced in Rahim's appellate brief and at oral argument is not present in Rahim's verified complaint. Rather, Rahim first presented this theory in its opposition to Equilon's summary judgment motion. The theory may nevertheless be considered on appeal, as it was properly placed in the district court record, and was not excluded by the district court in its consideration of Equilon's motion. *Equal Employment Opportunity Commission v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir.1993).

**470**

integration clause of the dealer documents."). Her acceptance of the integration clause at the time of the assignment nullifies any claims based on the alleged prior oral agreement.

Therefore, we conclude that the district court did not err in dismissing Rahim's breach of contract claim at summary judgment.

### C. Tortious Interference with Business Expectancy Claim

On appeal, Rahim revives its claim of tortious interference with contract and business expectancy. The essence of Rahim's claim is that Equilon unreasonably refused to consider or allow the sale of the franchise in the midst of Rahim's financial crisis, even after Rahim had located a willing purchaser.

Under Michigan law, the elements of a tortious interference with business expectancy claim are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional or improper interference with the relationship that induces or causes a breach or termination of the relationship or expectancy; and (4) resultant damages to the party whose relationship or expectancy has been disrupted. *DXS, Inc. v. Siemens Medical Sys., Inc.*, 100 F.3d 462, 469 (6th Cir.1996).

Equilon's conduct does not rise to the level of "improper interference." Michigan courts have defined "improper" as "illegal, unethical, or fraudulent." *Michigan Podiatric Medical Ass'n v. Nat'l Foot Care Program, Inc.*, 175 Mich.App. 723, 438 N.W.2d 349, 354 (1989). An act is not improper if the defendant is motivated by "legitimate business reasons." *BPS Clinical Laboratories v. Blue Cross Blue*

*Shield,* 217 Mich.App. 687, 552 N.W.2d 919, 925 (1996). As noted above, Equilon's decision to terminate the franchise, while it precluded a sale to another purchaser, was based on legitimate financial concerns, and was consistent with the PMPA. We therefore affirm the district court's grant of summary judgment on the tortious interference claim.

### D. Equilon's Breach of Contract Claim

Rahim contends that the district court erred in granting summary judgment to Equilon on its breach of contract claim against Rahim. Rahim does not dispute that it violated the literal terms of its contract with Equilon, but argues that there are genuine issues of material fact as to whether its financial crisis was caused by Equilon's own improper conduct. *See Flamm v. Scherer*, 40 Mich.App. 1, 198 N.W.2d 702, 706 (1972).

As discussed above, however, Rahim's breach of contract claim against Equilon, along with its other causes of action, were properly dismissed at the summary judgment stage. Absent a showing that Equilon breached the agreement first, Rahim's failure to perform was not excused. We conclude that district court properly granted summary judgment to Equilon on its breach of contract claim.

### *CONCLUSION*

For the reasons stated above, we affirm the grants of summary judgment in favor of Equilon.