**HILLMEN, INCORPORATED,**
**Plaintiff**

v.

**LUKOIL NORTH AMERICA,**
**LLC, Defendant.**

**Civil Action No. 13–4239.**

United States District Court,
E.D. Pennsylvania.

Nov. 22, 2013.

Glen R. Morris, Philadelphia, PA, for Plaintiff.

Brett Adam Berman, Robert S. Tintner, Rochelle Laws, Fox Rothschild LLP, Philadelphia, PA, for Defendant.

### MEMORANDUM OPINION and ORDER

NITZA I. QUIÑONES ALEJANDRO, District Judge.

### INTRODUCTION

On July 23, 2013, Hillmen, Inc., ("Plaintiff" or "Hillmen") filed a complaint pursuant to the Petroleum Marketing Practices Act (the "PMPA"),[1] against Lukoil North America, LLC, ("Defendant" or "Lukoil") claiming that its petroleum marketing franchise agreement was wrongfully terminated. At the same time, Plaintiff filed a motion for a preliminary injunction [ECF 2], to which Defendant responded on August 22, 2013. [ECF 9].[2]

---

1. 15 U.S.C. § 2801 *et seq.*

2. After Plaintiff filed its motion for a preliminary injunction, Plaintiff agreed to a 10 day

On October 17, 2013, an evidentiary hearing on the preliminary injunction motion was held.[3] Testimony and evidence was introduced through Zahid Khan, Plaintiff's principal, and through Jake Naggy, Defendant's Retail Operations and Regional Sales Manager. Following the hearing, the parties submitted supplemental briefs. [ECF 18 and 19].

For the reasons stated herein, Plaintiff's motion for a preliminary injunction is denied.

## FACTS

Plaintiff is a Pennsylvania corporation owned and operated by its principal and president, Zahid Khan. Defendant is alleged to be a corporation with its principal place of business in New Jersey and engaged in the business of distributing LUKOIL brand motor fuel in Pennsylvania, New York and New Jersey.

Plaintiff operated a gas station and convenience store located at 9100 Frankford Avenue, Philadelphia, Pennsylvania, (the "Station") under the "Lukoil" trade name. Plaintiff purchased the Station from a former franchisee in December 2006 and then entered into a three-year franchise agreement (the "Franchise Agreement") with Defendant in February 2007. The Franchise Agreement was renewed on February 1, 2010 and, again, on February 1, 2013. Under the Franchise Agreement Plaintiff, *inter alia*, leased the premises from Defendant, paid rent, and agreed to purchase Defendant's motor fuel and resell it to consumers under the Lukoil trademark.

Evidence submitted with the parties' filings and offered during the preliminary injunction hearing established that beginning in March 2007, and continuing until April 3, 2013, there were numerous occasions when Defendant sent written notices to Plaintiff that it was in breach of the Franchise Agreement; *to wit:*

By letter dated March 30, 2007, Plaintiff was advised that it was in default of the Franchise Agreement for failing to pay timely for the delivered motor fuel. Though Plaintiff eventually paid the then outstanding invoices, Defendant advised Plaintiff that future defaults could result in the revocation of Plaintiff's credit and being placed on "PRE–PAID status."[4] Similar default notices for failure to timely pay for motor fuel were sent on September 14, 2007, August 5, 2008, August 20, 2008, and December 9, 2008.[5] By letter dated August 5, 2008, Defendant notified Plaintiff that the Station had been allowed to run out of its motor fuel inventory and issued a demand to Plaintiff to immediately purchase and market the Lukoil branded motor fuel. Defendant advised Plaintiff that its failure to comply with this directive would constitute a "substantial" violation of the Franchise Agreement. Defendant also reminded Plaintiff that the PMPA allowed Defendant to terminate the Franchise Agreement should Plaintiff fail to sell Lukoil motor fuel for seven consecutive days.[6] By letter dat-

extension for Defendant to respond to the motion. [ECF 7].

3. The evidentiary hearing was initially scheduled for September 19, 2013; however, at Plaintiff's request it was rescheduled for October 17, 2013. [ECF 13].

4. PRE–PAID status required that Plaintiff pay cash before the delivery of any motor fuel.

5. During the hearing, Mr. Khan testified that sometime in 2008, an accounting error by Defendant was eventually reconciled in Plaintiff's favor.

6. Defendant sent Plaintiff similar notices on September 4, 2008, and on December 9, 2008.

ed September 9, 2008, Defendant advised Plaintiff that it was terminating the Franchise Agreement because of Plaintiff's continued failure to pay for the motor fuel.[7] Apparently, the franchise Agreement was not terminated. By letter dated October 26, 2012, Defendant advised Plaintiff that it would not renew the Franchise Agreement set to expire on January 31, 2013, because Plaintiff had refused to accept a number of changes to the agreement Defendant deemed necessary and reasonable for its operations. Notwithstanding the initial disagreement over the proposed modified terms, the parties eventually came to an understanding and executed a new franchise agreement with an effective date of February 1, 2013.

Critical to this motion for preliminary injunction are the events related to the delivery of motor fuel on Tuesday, February 19, 2013, around 11:50 P.M. Mr. Khan testified that he had expected that the delivery would be made on the morning of Wednesday, February 20, 2013, but admitted that it was, in fact, delivered *and* accepted late Tuesday evening. Mr. Khan further testified that he had inquired of Defendant when Plaintiff's account would be debited for this delivery and, allegedly, was told that the account would be debited the following Monday, February 25, 2013. Plaintiff's account, however, was debited on the morning of Friday, February 22, 2013, which caused the payment to "bounce" for lack of insufficient funds.

Mr. Khan acknowledged that under the scheduled credit payment plan with Defendant, Plaintiff was required to pay for delivered fuel by an electronic fund transaction ("EFT") three "business days" after

a delivery was made. As to this particular delivery, Mr. Khan testified that he was under the impression that since the fuel was delivered during the late evening hours of Tuesday, February 19, 2013, the payment did not need to be made until the following Monday, February 25, 2013. On this issue, Defendant refuted Mr. Khan's testimony with Jake Naggy, its Manager of Retail Operations. He testified that he is the person responsible for implementing Defendant's EFT policy, which had been reiterated to all franchisees by notice dated October 16, 2012; *to wit:*

> Please be reminded that LUKOIL North America's payment terms for dealers who have been extended credit are that the EFT will occur on the third business day following the date of Bill of Lading (BOL). The date of BOL is the date that the load was lifted at the terminal. Please refer to www.lnallc.com for all EFT draft dates, and see below example:

| BOL Day | EFT Day |
|---------|---------|
| Monday | Thursday |
| Tuesday | Friday |
| Wednesday | Monday |
| Thursday | Tuesday |
| Friday | Wednesday |
| Saturday | Wednesday |
| Sunday | Wednesday |

> Note: Bank holidays will not be counted as business days.[8]

Mr. Naggy testified that in accordance with this schedule, for example, any fuel delivered on Tuesday must be paid for by EFT on Friday. He further testified that a business day under the policy is any 24–hour day, other than a weekend or holiday, not the "9–5 business day" espoused by Mr. Khan. It is noted, that neither the

---

**7.** Although not addressed in the parties' briefs, the parties appeared to have resolved the dispute and continued their franchise relationship.

**8.** Exhibit D–4.

content of the letter nor the illustrative chart draws any distinction for fuel deliveries after 5:00 P.M. (or any particular time).

Mr. Naggy's testimony was corroborated by other documentation submitted during the hearing. In particular, Defendant offered a collection of bills of laden and invoices (Exhibit D–3) corresponding to fuel deliveries made to Plaintiff between December 21, 2012, and February 23, 2013. Each of the invoices, including one corresponding to the February 19, 2013 fuel delivery, shows a "Due Date," three calendar days after the fuel delivery date, not counting the weekends or holidays, even when the delivery was made after 5:00 P.M., *i.e.*, what Plaintiff described as "after business" hours. For example, this particular exhibit shows that Plaintiff received a delivery of fuel on Tuesday, February 5, 2013, sometime after 9:49 P.M., and had a "Due Date" of Friday, February 8, 2013. (*See* Exhibit D–3 at pp. 5–6).

Plaintiff also introduced evidence that supported Mr. Naggy's testimony. Specifically, Plaintiff introduced a document which listed EFT transactions from Plaintiffs account originating between January 9, 2013, and April 15, 2013 (Exhibit P–3). This document shows that Plaintiff's EFT account was charged for the delivery made "after business hours" on Tuesday, February 5, 2013, on Friday, February 8, 2013, three days later, similarly to the transaction involving the Tuesday, February 19, 2013 delivery.[9]

As the result of his nonpayment for the February 19, 201 delivery, Plaintiff was placed on "prepaid" status on Monday, February 24, 2013. This status required Plaintiff to pay for future fuel *prior to* its delivery. Notably, under the terms of the Franchise Agreement, Plaintiff was required to pay for fuel "prior to delivery," unless Defendant, "in its sole discretion," offered and agreed to other credit terms. *See* Franchise Agreement §§ 2.3 and 2.4. The Franchise Agreement also permitted Defendant to "revoke credit, at any time." *Id.* at § 2.4(a).

At the hearing, Mr. Khan conceded that Plaintiff did not pay for the fuel on Friday, February 22, 2013. He also admitted the invoice was not paid on the date when Plaintiff deemed it due (on Monday). Plaintiff further conceded that as of the date of the hearing, the money owed for the February 19, 2013 motor fuel delivery had still not been paid, nor had it paid for the motor fuel delivered on Saturday, February 22, 2013.[10] Although Mr. Khan disputes the amount Defendant says Plaintiff owes it, Mr. Khan admitted that Plaintiff owes Defendant an undetermined debt.

By two letters dated March 6, 2013, Plaintiff was notified it had a past due and unpaid balance of $71,008.21, and had failed to maintain an adequate inventory of motor fuel at the premises. Defendant demanded that Plaintiff immediately recommence its purchase of motor fuel from Defendant and market the fuel to the motoring public. These letters again reminded Plaintiff that the PMPA permits the termination of the Franchise Agreement if it failed to sell motor fuel at the Station for seven consecutive days.[11]

---

9. Upon consideration of the evidence presented, this Court opines that Plaintiff was required to pay for fuel deliveries within three days of the delivery, regardless of whether the delivery was made "after business hours."

10. During the hearing, Mr. Khan admitted that Plaintiff owed at least $40,000 for the

two February fuel deliveries, after taking into consideration application of some or all of Plaintiff's $45,000 security deposit.

11. By letter dated March 26, 2013, Defendant notified Plaintiff of additional defaults of the Franchise Agreement.

By letter dated April 3, 2013, Defendant notified Plaintiff of the termination of the Franchise Agreement (the "Termination Letter"), explaining that: (1) Plaintiff failed "to sell any gasoline at the [Premises] in the period from at least March 11, 2013 to present," and (2) Plaintiff "abandoned the franchise, the franchise relationship and the Franchise Agreement." The Termination Letter also set forth the following purported breaches by Plaintiff:

(i) intentionally not operated the Marketing Premises to be employed under the franchise in connection with sale or distribution of motor fuel, for a period of seven (7) consecutive days, i.e., in the period at least March 11, 2013 to present, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time:

(ii) intentionally not operated the Marketing Premises to be employed under the franchise during operating hours required by the PMPA Franchise Agreement, and intentionally failed to keep the motor fuels business open and in normal operation for those periods:

(iii) failed to use good faith and best efforts to maximize the sale of Products at the Marketing Premises as required by the PMPA Franchise Agreement; and

(iv) failed to maintain an adequate inventory of motor fuel to serve the needs of the motoring public at the Marketing Premises.

Defendant concluded that these breaches required the termination of the Franchise Agreement effective on April 9, 2013.

Plaintiff does not dispute that it failed to purchase motor fuel from Defendant, or that it remained closed without selling motor fuel for more than seven consecutive days. Rather Mr. Khan admitted that the Station ran out of fuel and had not sold any fuel since March 2013. Mr. Khan further admitted that as of the date of the hearing, Plaintiff had still not paid for the two fuel deliveries previously described, had not paid any rent for the premises since February 2013, and currently owes at least $50,000 in rent. As justification for these defaults, Mr. Khan alleges that Plaintiff's inability to meet these financial obligations was caused by Defendant's wrongful conduct of charging for the delivered fuel before the scheduled date, which resulted in Plaintiff being placed on "prepay" status, leading to its inability to pay in advance for fuel deliveries.

## STANDARD OF REVIEW

The PMPA was enacted in 1978 to protect a franchisee's reasonable expectation of continuing a franchise relationship while at the same time insuring that distributors have adequate flexibility to respond to changing market conditions and consumer preferences. *Patel v. Sun Company, Inc.*, 63 F.3d 248 (3d Cir.1995). The PMPA was intended to mitigate the perceived disparity in bargaining power between franchisors and franchisees by protecting the latter from arbitrary or discriminatory terminations or non-renewals. *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 587 (3d Cir.1989); *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3d Cir.1987). The PMPA attempts to alter this imbalance by 1) regulating the grounds and conditions for which distributors may terminate or fail to renew a franchise and 2) by creating an exclusive cause of action for aggrieved franchisees to challenge such actions. *See* 15 U.S.C. §§ 2802(b)(1) and 2805; *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 294 (3d Cir.2008). The PMPA's primary goal is to provide protection to the franchisee. *Rodgers v. Sun Refining and Marketing Company*, 772 F.2d 1154, 1158 (3d Cir.1985). For "legitimate needs," however, a franchisor can termi-

nate the franchise based upon one of the enumerated grounds set forth in the statute. *Id.* (quoting *Sun Refining and Marketing Company v. Rago,* 741 F.2d 670, 673 (3d Cir.1984)).

The PMPA also authorizes courts, where appropriate, to issue a preliminary injunction in order to preserve the franchise relationship while a termination dispute is litigated. It provides a lower threshold for obtaining a preliminary objection than ordinarily required under the Federal Rules of Civil Procedure. *Brownstein v. Arco Petroleum Products, Co.,* 604 F.Supp. 312, 314 (E.D.Pa.1985). Under the PMPA, a court must grant a preliminary injunction if the franchisee shows that: (1) the franchise of which it is a party has been terminated; (2) there "exist serious questions going to the merits to make such question a fair ground for litigation;" and (3) the hardship a preliminary injunction would place on the franchisor "will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." 15 U.S.C. § 2805(b)(1, 2).

The PMPA does not define what constitutes a "serious question ... that ... is a fair ground for litigation." However, courts have generally interpreted this element as requiring a plaintiff to show that it has "a reasonable chance of success" on the merits but "something far less than ... 'probability or likelihood.' " *Saad v. Shell Oil Co.,* 460 F.Supp. 114 (E.D.Mich. 1978); *see also Nassau Boulevard Shell Service Station, Inc. v. Shell Oil Co.,* 875 F.2d 359, 363 (2d Cir.1989); *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1217 (7th Cir.1984).

Section 2805(b)(4) provides that the court "need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced (A) more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee ... or (C) more than 30 days after the date on which the termination of such franchise ... takes effect if less than 90 days notification was provided pursuant to section 2804(b)(1) of this title." 15 U.S.C. § 2805(b)(4)(A) and (B). Pursuant to this provision, courts have declined to grant a franchisee injunctive relief where it commenced the action after the expiration of the applicable deadline. *See e.g. Kesselman v. Gulf Oil Corp.,* 479 F.Supp. 800, 804 (E.D.Pa.1979), *aff'd,* 624 F.2d 1090 (3d Cir.1980); *Cantrell v. Exxon Co., U.S.A.,* 574 F.Supp. 313, 318 (M.D.Term.1983); *Walters v. Chevron U.S.A., Inc.,* 476 F.Supp. 353, 357 (N.D.Ga.1979), *aff'd,* 615 F.2d 1135 (5th Cir.1980); *Daras v. Star Enterprise,* 1992 WL 345664, *3 (D.Md. Nov. 12, 1992).

The PMPA provides limited grounds upon which a franchisor can terminate a franchise agreement. *Sun Refining and Marketing Co. v. Rago,* 741 F.2d 670, 673 (3d Cir.1984); 15 U.S.C. § 2802(b)(2). Section 2802(b)(2)(A) provides that a franchisor may terminate a franchise relationship if there is a "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." The Act does not define "reasonable" or "material significance." Courts have interpreted these terms, however, by keeping with the common and ordinary use and meanings of these terms; such as, contractual terms that are vital to the franchise agreement[12]

---

**12.** *NSY, Inc. v. Sunoco, Inc.,* 218 F.Supp.2d 708 (E.D.Pa.2002) (citing *DiNapoli v. Exxon Corp.,* 549 F.Supp. 449 (D.N.J.1982)).

or when the franchisee failed to comply with a franchise provision that is both conscionable and of real importance or great consequence to the franchise relationship.[13] The Third Circuit's "materiality" test inquires whether the franchise agreement provision is a non-technical requirement and is a "significant substantive requirement relating to the way the franchisee must run his business." *O'Shea*, 886 F.2d at 595 n. 11. Termination under this subsection does not require that the franchisor provide the franchisee the opportunity to cure. *Id.* at 595.

■ The franchise can also be terminated for a "failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise if the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions." 15 U.S.C. § 2802(b)(2)(B). Termination under this provision is permissible without consideration as to the reasonableness of the contractual provision so long as the franchisee is given an opportunity to comply. *O'Shea*, 886 F.2d at 595.

Termination is also permitted if there is an "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(C). An "event" within the meaning of this subsection expressly includes, *inter alia*, "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled" and "failure by the franchisee to operate the marketing premises for 7 consecutive days." § 2802(c)(8) and (9). In addition, the Third Circuit has concluded that a franchi-

see's failure to have fuel available for sale may be a basis for termination or nonrenewal under § 2802(b)(2)(C). *Rodgers*, 772 F.2d at 1157.

## DISCUSSION

Here, the parties agree that Plaintiff is a franchisee and that the franchise relationship was terminated. Thus, this Court need only address whether there are "serious questions going to the merits to make such questions a fair ground for litigation" and balance the respective hardships. At issue is whether Defendant conformed to the requirements of the PMPA when it gave notice of termination of the franchise on April 3, 2013. If Defendant's termination was in conformity with the PMPA, there is no sufficiently serious question going to the merits and forming a fair ground for litigation and, therefore, there is no basis for a preliminary injunction under Section 2805.

However, before addressing the merits of said issue, this Court recognizes that it may decline to exercise its equity powers to issue an injunction if the franchisee commences the action more than 90 days after the franchisor gives notice pursuant to § 2804(a) or more than 30 days after the termination takes effect where less than 90 days' notice was provided pursuant to § 2804(b)(1). Here, by notice dated April 3, 2013, Defendant terminated the franchise effective on April 9, 2013. As such, Plaintiff was required to commence this action seeking equitable relief within 30 days of the April 9, 2013 termination. Plaintiff, however, did not commence this action and/or seek an injunction until July 23, 2013, more than 100 days after the notice of termination. Under § 2805(b)(4)(A) and (C), Plaintiff's untimely commencement of this action is sufficient grounds for this Court to decline to

---

**13.** *Id.* (citing *Doebereiner v. Sohio Oil Co.,* 880 F.2d 329 (11th Cir.1989)).

exercise its equity powers and issue a preliminary injunction. It will decline to dismiss this motion on this ground and will address the merits of this matter.

The PMPA requires notice regarding a non-renewal or termination. The notice must be in writing and personally delivered or sent by certified mail to the franchisee, 15 U.S.C. § 2804(c), and must state the intent to terminate, the reasons therefore, the date the termination will take effect, and be accompanied by a summary of the PMPA. 15 U.S.C. § 2804(c)(3). Generally, the PMPA requires ninety days advance notice of the effective termination. § 2804(a)(2). A shorter notice is permitted, however, where it would not be reasonable for a franchisor to provide ninety days, provided that the franchisor gives notice on the earliest practicable date. 15 U.S.C. § 2804(b)(1); *In re Ramreddy, Inc.*, 440 B.R. 103, 110 (Bankr.E.D.Pa. 2009) ("there are circumstances when it would not be reasonable" to give ninety days).

The PMPA does not, itself, provide any guidelines for determining what circumstances justify providing less than ninety days' notice. A review of case law where courts have addressed the notice issue, however, makes it clear that a determination of reasonableness must be done on a case by case basis. When making that determination, some courts have held that less than ninety days' notice of termination may be given, if, as alleged here, the franchisee has defaulted monetarily and failed to operate for seven consecutive days. *See e.g., Equilon Enterprises, L.L.C. v. Rahim, Inc.*, 80 Fed.Appx. 463, 468 (6th Cir.2003) (allowing immediate termination and noting that the notice provision "has been interpreted to allow franchisors significant latitude when a franchisee has been delinquent in making payments to the franchisor."); *Dedvukaj v. Equilon Enterprises,*

*L.L.C.*, 301 F.Supp.2d 664, 669–70 (E.D.Mich.2004), *aff'd,* 132 Fed.Appx. 582 (6th Cir.2005) (allowing immediate termination for delinquent payments); *Marathon Petroleum Co. v. Pendleton,* 889 F.2d 1509, 1513 (6th Cir.1989) (finding ten days' notice reasonable given franchisee's "declining interest in operating the station and failure to maintain adequate gasoline supplies."); *Atlantis Petroleum, LLC v. Getty Petroleum Marketing, Inc.,* 2011 WL 4348285, *11 (E.D.Pa. Sept. 16, 2011) (finding thirty days' notice reasonable where franchisee had substantial outstanding debt to franchisor and history of untimely payments); *Loomis v. Gulf Oil Corp.,* 567 F.Supp. 591, 597 (M.D.Fla.1983) (eight-day notice justified when franchisee developed deficiency of $56,233.52 in thirty to sixty days); *California Petroleum Distributors v. Chevron U.S.A. Inc.,* 589 F.Supp. 282, 289 (E.D.N.Y.1984) (finding sixteen days' notice of termination for nonpayment of past-due amounts was reasonable notice in view of fact that it came after four months of demands for payment); *California Petroleum Distributors v. Chevron, U.S.A.,* 589 F.Supp. 282, 289 (E.D.N.Y.1984) (finding that a sixteen days' notice of termination under the circumstances where the franchisee had accumulated a substantial debt exceeding its credit limit with the franchisor).

■ Like the franchisees in many of the above cited cases, Plaintiff was repeatedly warned of its failures to timely pay outstanding balances and the potential consequences thereof. On April 3, 2013, Defendant sent a letter advising Plaintiff that the franchise agreement would be terminated effective April 9, 2013. At the time of the termination, Plaintiff admittedly had not paid outstanding invoices attributable to two deliveries of fuel, had failed to operate the Station for at least a month, and had not sold fuel for more than seven

consecutive days. Defendant calculated that the debt exceeded $71,000. Plaintiff admitted that as of the date of the hearing (which was held more than seven months after the effective date of termination), it had still not paid what it admitted were outstanding invoices for delivered fuel and rent due, and would have to borrow money to make even a partial payment. Under these facts and circumstances, this Court finds that Defendant's six days' notice for termination was reasonable.[14]

In the termination notice, Defendant stated the following reasons for termination: (i) Hillmen's failure to sell fuel at the station for at least 23 days (as of the date of the notice); (ii) Hillmen's failure to operate the station for seven consecutive days; (iii) Hillmen's failure to operate the station as required by the Franchise Agreement; and (iv) Hillmen's failure to maintain an adequate supply of motor fuel. Defendant's stated reasons for termination fall well within the parameters of a lawful termination under the PMPA. It is hard to construe Plaintiff's admitted failure to sell gasoline for at least 23 days and its failure to operate the Station for seven consecutive days as anything other than breaches of reasonable and material provisions of the Franchise Agreement.[15] Under the PMPA's express definitions, a franchisee's failure to sell gas for seven consecutive days is deemed an "event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(c)(9)(A).

While Plaintiff concedes that it did not purchase or sell any additional gasoline after being placed on prepay status on

February 24, 201, it argues, however, that its failures or inabilities to pay were beyond its reasonable control and, therefore, do not constitute valid grounds for termination under the PMPA. Specifically, Plaintiff contends that the failure to pay for the delivered fuel and to operate the premises as required were caused by Defendant's wrongful conduct of placing Plaintiff on prepay status on February 24, 2013.

Section 2801(13) of the PMPA excludes from the definition of "failure" "any failure for a cause beyond the reasonable control of the franchisee." 15 U.S.C. § 2801(13). This exclusion has been considered as "merely a legislated excuse for nonperformance," which reflects a judgment that "unforeseen circumstances may impede compliance" with certain, otherwise reasonable, franchise requirements. *Sun Refining and Marketing Co. v. Rago*, 741 F.2d 670, 673 (3rd Cir.1984) (citing *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1224 n. 16 (7th Cir.1982)). Courts that have addressed this "legislative excuse for nonperformance" issue have held that a franchisee's lack of funds to pay invoices, for whatever reason, cannot be characterized as a cause beyond the franchisee's reasonable control. *See e.g., Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.*, 2013 WL 395096, *10 (S.D.N.Y. Feb. 1, 2013) (noting that "general economic hardship—a 'plain, ordinary failure to pay a debt for shortage of cash'—cannot excuse a failure under Section 2801(13)(B)."); *Cantrell v. Exxon Co. U.S.A.*, 574 F.Supp. 313, 317–18 (M.D.Tenn.1983); *Talbert–Siebert Ent., Inc. v. Shell Oil Co.*, 1992 WL

---

14. Notably, despite terminating the franchise as of April 9, 2013, as of the date of the hearing, Plaintiff had not been evicted and was still operating the convenience store located at the station.

15. Pursuant to the terms of the Franchise Agreement, Plaintiff was required to "keep the Motor–Fuels Business open and in normal operation" 24 hours a day, 7 days a week. *See* Franchise Agreement §§ 9.3 and 9.4.

119916, at \*7 (M.D.La. May 8, 1992) ("As a matter of law, economically difficult times are not an excuse for failure by the franchisee to timely pay to the franchisor all sums to which the franchisor is legally entitled."); *ABJO Motors, Inc. v. Shell Oil Co.*, 856 F.Supp. 656, 658 (S.D.Fla.1994) ("A franchisee's lack of funds to pay rent due, for whatever reason, simply cannot be characterized as a cause beyond the franchisee's reasonable control. To treat it as such would render Section 2802(c)(8) meaningless."); *Cal. Petroleum Distibs. Inc. v. Chevron U.S.A. Inc.*, 589 F.Supp. 282 (E.D.N.Y.1984) (finding that the PMPA specifically provided that nonpayment is a violation of the franchise agreement and grounds for termination destroys any contention that nonpayment should be construed as matter beyond the franchisee's control.")

Notwithstanding, Plaintiff argues that its "failures" fall within the statutory exclusion because they were allegedly caused by Defendant's wrongful acts. To support this argument, Plaintiff points to the following: (1) Defendant's increase in rents, cessation of maintenance stipends and addition of real estate taxes; (2) Defendant's incorrect debit from Plaintiff's account in February 2013 for rent; and (3) Defendant's premature debit from Plaintiff's account on February 22, 2013, for fuel Plaintiff admittedly received on February 19, 2013. The Court finds that based upon the evidence presented, none of these occurrences excuse Plaintiff's failure to pay for the delivered fuel or operate the premises. Plaintiff presents no evidence to establish that Defendant's purported increase in rent and cessation of stipends was unlawful or outside the scope of Defendant's allowable business discretion. Despite receiving notices from Defendant in that Plaintiff would no longer receive the maintenance stipend and that it would be required to pay property taxes, Plaintiff

admittedly renewed the Franchise Agreement on November 2012, months prior to its effective date of February 1, 2013. The renewed Franchise Agreement included these modifications and the increased rent provisions. *See* Lease at §§ 2.1, 2.2 and 3.1. As such, Plaintiff cannot rely upon these contractual modifications, to which it agreed, to justify or excuse its failure to pay for the delivered fuel or to operate the Station.

Plaintiff's reliance on the improper debit from its account in February for rent is equally misplaced as the error was corrected before Plaintiff's account was debited for the February 19, delivery. Thus, Plaintiff has not established that the rent debit caused Plaintiff's failure to timely pay for the delivered fuel; or its continued failure to pay for the fuel nearly nine months after it was delivered.

While Plaintiff focused on the ECF transaction pertaining to the Tuesday, February 19, 2013 fuel delivery as a reason for his default, as stated, this Court finds Defendant's proffered interpretation of its ECF credit policy more credible and consistent with both the description of the policy outlined in the October 16, 2012 letter (Exhibit D–4) and the parties' past practices. What is more compelling is Plaintiff's admission that as of the date of the hearing, it had still not paid for the fuel deliveries made during the period, nor did it have the means to make any payment toward the debt. Clearly, the failures cited in Defendant's April 3, 2013 termination letter are not attributable to "a cause beyond the reasonable control of the franchisee."

For this Court's analysis, Plaintiff has also failed to demonstrate that the balance of hardships tips in its favor. The Court is aware of the relative disparity in size between Plaintiff and Defendant. When con-

fronted with a small business franchisee, such as Plaintiff, seeking relief from a much larger franchisor, such as Defendant, courts have found that it is "not difficult for the franchisee to show that it will suffer the greater hardship if a preliminary injunction is denied." *Rising Micro, LLC v. Exxon Mobil Oil Corp.*, 2006 WL 1193839, at *11 (D.D.C. May 3, 2006). However, mere financial hardship alone, even hardship that may threaten the very existence of the franchisee, is not conclusive of the balancing of hardship inquiry. *Id.* at *11–12.

 Upon the evidence presented, we are unable to conclude that Plaintiff stands to suffer a greater hardship than Defendant if a preliminary injunction is not granted. By its own admission, Plaintiff has failed to pay for at least two deliveries of fuel, for which it owes at least $40,000, has failed to pay rent for the premises since March 2013, for which it owes at least $50,000, and has ceased operating the Station as of at least March 2013. In addition, during the hearing, Plaintiff was unable to establish its ability to resume operating the Station if a preliminary injunction was issued. In light of these concessions, Plaintiff has not shown that the hardship placed on Defendant by a preliminary injunction would "be less than the hardship" imposed upon Plaintiff if a preliminary injunction is not granted.

## CONCLUSION

The Court finds that Plaintiff has not established a serious question going to the merits as required to grant a preliminary injunction under the PMPA. 15 U.S.C. § 2805(b)(2)(A)(ii). Accordingly, Plaintiff's motion for a preliminary injunction pursuant to 15 U.S.C. § 2805(b)(2) is denied. An order consistent with this memorandum follows.

## ORDER

**AND NOW**, this 22nd day of November 2013, upon consideration of Plaintiff's *motion for preliminary injunction* [ECF 2], Defendant's response in opposition thereto [ECF 9], the evidence presented during the hearing held on October 17, 2013, and the parties' supplemental briefs [ECF 18 and 19], it is hereby **ORDERED** that, for the reasons set forth in the Memorandum Opinion filed on this date, the motion is **DENIED**.